RYAN K. YAGURA (S.B. #197619)
ryagura@omm.com
NICHOLAS J. WHILT (S.B. #247738)
nwhilt@omm.com
XIN-YI ZHOU (S.B. #251969)
vzhou@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407

*Attorneys for Defendants The Walt Disney Company, Disney Media and Entertainment Distribution LLC, Disney DTC LLC, Disney Streaming Services LLC, Disney Entertainment & Sports LLC, Disney Platform Distribution, Inc., BAMTech LLC, Hulu, LLC, and ESPN, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION AT LOS ANGELES

| | |
|---|---|
| INTERDIGITAL INC., INTERDIGITAL VC HOLDINGS, INC., INTERDIGITAL MADISON PATENT HOLDINGS, SAS, AND INTERDIGITAL CE PATENT HOLDINGS, SAS, <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> THE WALT DISNEY COMPANY, DISNEY MEDIA AND ENTERTAINMENT DISTRIBUTION LLC, DISNEY DTC LLC, DISNEY STREAMING SERVICES LLC, DISNEY ENTERTAINMENT & SPORTS LLC, DISNEY PLATFORM DISTRIBUTION, INC., BAMTECH, LLC, HULU, LLC, AND ESPN, INC., <br><br> Defendants and Counterclaim-Plaintiffs. | Case No. 2:25-cv-895-WLH-BFM <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION RELATED TO INTERDIGITAL'S REQUEST FOR INJUNCTION IN BRAZIL** <br><br> Judge: Hon. Wesley L. Hsu <br> Magistrate: Hon. Brianna F. Mircheff <br> Hearing: May 30, 2025 at 1:30 pm |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................... 3

    I.      The Lawsuits in the United States and Brazil. ...................................... 3

    II.     Standards and RAND Commitments. .................................................... 4

    III.    The Accused Compression Standards. ................................................. 6

    IV.    InterDigital's Patents Are RAND-Encumbered. ................................. 7

          A.      InterDigital and Its Predecessor-in-Interest Committed to License the Patents Asserted in this Action and in Brazil on RAND Terms. ......................................................... 7

          B.      InterDigital Has Asserted the Patents as SEPs. ....................... 10

    V.     InterDigital Breached Its Contractual Obligations by Never Offering Defendants a License on RAND Terms. ............................. 11

    VI.    Enforcement of an Injunction in Brazil Would Irreparably Harm Defendants. ........................................................................................ 12

LEGAL STANDARD ......................................................................................... 13

ARGUMENT ...................................................................................................... 14

    I.      The Facts Weigh in Favor of a Preliminary Injunction Against Enforcement of an Injunction in Brazil. ............................................ 15

          A.      Defendants Meet Both Threshold Requirements. .................... 15

              1.      The Parties and Issues in the Domestic and Foreign Suits Are the Same. ....................................... 15

              2.      Defendants Meet *Gallo*'s "Dispositive" Requirement. ...................................................... 15

          B.      Multiple *Unterweser* Factors Militate in Favor of Issuing an Anti-Suit Injunction. ........................................................... 17

              1.      InterDigital's Enforcement of a Brazilian Injunction Will Frustrate Domestic and Public Policies. ........................................................................ 17

              2.      InterDigital's Foreign Injunction Actions Are Vexatious and Oppressive. ........................................ 18

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**
**(continued)**

**Page**

      3.    The Balance of Equities Tips Decisively in Defendants' Favor. ............................................................ 19

    C.    The Proposed Injunction Will Not Offend Principles of Comity. ...................................................................... 21

II.    A Preliminary Injunction Is Proper. ....................................................... 22

CONCLUSION ............................................................................................ 24

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple Inc. v. Motorola, Inc.*,
  869 F. Supp. 2d 901 (N.D. Ill. 2012)......................................................17, 20

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ...........................................................4, 5, 24

*Cadence Design Sys., Inc. v. Avant! Corp.*,
  125 F.3d 824 (9th Cir. 1997) .......................................................................20

*Conceptus, Inc. v. Hologic, Inc.*,
  2012 WL 44064 (N.D. Cal. Jan. 9, 2012) ...................................................20

*E. & J. Gallo Winery v. Andina Licores S.A.*,
  446 F.3d 984 (9th Cir. 2006) ..........................................................13, 18, 21

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000)......................................................20

*Huawei Techs., Co. v. Samsung Elecs. Co.*,
  2018 WL 1784065 (N.D. Cal. Apr. 13, 2018) .................................17, 18, 21, 22

*In re Unterweser Reederei GMBH*,
  428 F.2d 888 (5th Cir. 1970) .......................................................................13

*Microsoft Corp. v. Motorola, Inc.*,
  696 F.3d 872 (9th Cir. 2012) ..................................................................passim

*Microsoft Corp. v. Motorola, Inc.*,
  795 F.3d 1024 (9th Cir. 2015).....................................................................17

*Microsoft Corp. v. Motorola, Inc.*,
  864 F. Supp. 2d 1023 (W.D. Wash. 2012) ..................................................5

*Microsoft Corp. v. Motorola, Inc.*,
  871 F. Supp. 2d 1089 (W.D. Wash. 2012) ..........................................13, 15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001) .......................................................................20

*Telefonaktiebolaget LM Ericsson v. Lenovo (United States), Inc.*,
  120 F.4th 864 (Fed. Cir. 2024)................................................................passim

*Textile Unlimited, Inc. v. A..BMH & Co.*,
  240 F.3d 781 (9th Cir. 2001) .......................................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................14, 22

iii

**INTRODUCTION**

Over two decades ago, a United Nations specialized agency for digital technologies—the International Telecommunication Union ("ITU")—helped guide the development and commercial adoption of video coding standards used in streaming called H.264 and H.265 (together, the "Compression Standards"). The ITU accepted various video coding technologies from patent owners for incorporation into these standards that, once commercially adopted by an entire industry, would facilitate interoperability across commercial video streaming products and services. The ITU required developers to expressly agree to license any patents they believed to cover the Compression Standards on reasonable and non-discriminatory ("RAND") terms. A promise to license on RAND terms protects companies that were willing to invest millions of dollars and decades of development to create products and services that incorporated the Compression Standards from injunctions and unreasonable patent license demands. Such standardization also protects consumers from purchasing potentially obsolete formats when incompatible technologies—such as Betamax vs. VHS tapes—are introduced by competing companies. Indeed, the only way such complex technology can be universally adopted by an entire industry—including all competitors within that industry—is with fairness and cooperation, the foundation of which is the promise of RAND licensing terms.

InterDigital and its predecessor-in-interest expressly promised the ITU to license their Compression Standards patents on RAND terms. Now, however, InterDigital has reneged on that central promise and launched a global litigation campaign asserting its patents against Defendants' use of the Compression Standards. Specifically, InterDigital has asked a Brazilian court to issue an injunction preventing Defendants from implementing the Compression Standards.

In short, InterDigital's new patent licensing strategy is to ambush companies, like Defendants, that relied on the RAND promises that developers have made to

1

the ITU for decades. InterDigital's foreign patent litigation seeks to force Defendants to agree to licensing terms that are not "reasonable," or risk losing their entire investment in a market. InterDigital selectively sued in Brazil because its courts historically have granted injunctions in patent cases within months of the complaint being filed, even while the merits of the patents continue to be litigated. In fact, the Brazilian court could issue a preliminary injunction preventing Defendants from offering their Disney+ streaming platform in that country as soon as *June 2025*.

Allowing InterDigital to race to a court in Brazil to procure an injunction would improperly interfere with this Court's resolution of Defendants' RAND licensing claims and irreparably injure Defendants. If InterDigital were successful in ignoring its RAND promises, it would also undermine the very framework that facilitated the cooperative creation of the Compression Standards between developers and commercial entities. The standard-setting process only works because standard-setting organizations ("SSOs"), such as the ITU, require their participants who own patents that read on a standard to grant licenses on RAND terms. Without such RAND licensing obligations, after an industry adopts a standard, one patent owner could undermine the standard by seeking injunctive relief against its use unless the entire industry pays excessive, non-RAND royalties. Such conduct, if permitted here, will ultimately harm consumers by reducing competition and increasing prices of services that rely on the Compression Standards.

Defendants have already filed counterclaims in this action relating to InterDigital's breach of its RAND licensing obligations. By this motion, Defendants seek a preliminary injunction to prevent irreparable injury to Defendants arising from InterDigital's concurrently filed Brazilian lawsuit. Specifically, as other courts have done in similar circumstances, Defendants seek a preliminary injunction preventing InterDigital from enforcing injunctive relief in

Brazil until this Court determines whether InterDigital breached its RAND licensing obligations. This remedy would not affect the merits of the Brazilian action in any way. The Ninth Circuit and U.S. district courts have enjoined plaintiffs from enforcing such injunctions in foreign countries, including in a case involving the same Compression Standards that are the sole basis for InterDigital's infringement claims in Brazil.

Defendants satisfy each element of the three-prong test that courts apply when considering whether to issue such an injunction. *First*, Defendants satisfy the two threshold requirements because the parties and issues are the same in both the domestic and foreign suits. This action will also be dispositive of whether injunctive relief is permissible in Brazil. *Second*, while Defendants need only satisfy one so-called *Unterweser* factor to qualify for an injunction, Defendants satisfy at least three. *Finally*, Defendants' proposed injunction is narrowly tailored in both scope and time and will have no intolerable impact on comity. The Court should issue the proposed preliminary injunction and maintain the status quo.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.    The Lawsuits in the United States and Brazil.

InterDigital filed its Complaint in this action on February 2, 2025. *See* Dkt. 1. It alleges that Defendants infringe five patents: U.S. Patent Nos. 8,406,301 (the "'301 Patent"), 10,805,610 (the "'610 Patent"), 11,381,818 (the "'818 Patent"), 9,185,268, and 8,085,297. *Id.* ¶ 1, Exs. A.1-E.1. One day later, an InterDigital affiliate and Plaintiff in this case—InterDigital VC Holdings, Inc.—filed a complaint against The Walt Disney Company (Brasil) LTDA in Brazil (the "Brazilian Action"). Declaration of Natalia Barzilai ("Barzilai Decl.") ¶ 3.

In the Brazilian Action, InterDigital alleges that Defendants' Brazilian affiliate infringes Brazilian Patent Nos. PI0305519-1 and PI0318825-6 (the "Brazilian Patents"). *Id.* ¶ 5. InterDigital asks the Brazilian court to issue preliminary and permanent injunctions that would effectively exclude Defendants'

3

Disney+ streaming platform from Brazil. *Id.* ¶ 6. If the Brazilian court finds in InterDigital's favor, it may issue a preliminary injunction enjoining Defendants from offering the Disney+ streaming platform in Brazil as soon as June 2025. Barzilai Decl. ¶¶ 10-13.

## II.    Standards and RAND Commitments.

Industry standards "ensure the interoperability of products [and] facilitate the sharing of information among purchasers of products from competing manufacturers, thereby enhancing the utility of all products and enlarging the overall consumer market." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007). The Compression Standards are the reason Defendants' Disney+ streaming platform, Netflix, YouTube, and other platforms can stream video to different hardware manufacturers' (*e.g.*, Apple and Samsung) devices. To succeed, industry stakeholders must "all use the same set of standards when designing their devices and networks to ensure compatibility between various devices and networks." *Id.*

SSOs play an essential role in the standard-setting process. Technical standards often incorporate a variety of patented and un-patented technologies. In selecting technologies to include in a standard, however, SSOs may effectively enable patent holders to abuse their position, as the Third Circuit has explained:

> [T]he patent holder is in a position to "hold up" industry participants from implementing the standard. Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard. In this unique position of bargaining power, the patent holder may be able

4

1                to extract supracompetitive royalties from the industry

2                participants.

3 *Broadcom*, 501 F.3d at 310.

4       Recognizing this risk, many SSOs have adopted intellectual property rights

5 ("IPR") policies that minimize the potential for exploitation. IPR policies generally

6 require participants to timely disclose patent rights during the standard-setting

7 process. Disclosure enables SSOs to make informed decisions in considering

8 alternative technical proposals. These policies also generally require participants

9 who claim to own patents that read on the standard to grant licenses on RAND

10 terms. *See Broadcom*, 501 F.3d at 313 ("To guard against anticompetitive patent

11 hold-up, most S[S]Os require firms supplying essential technologies for inclusion

12 in a prospective standard to commit to licensing their technologies on []RAND

13 terms.").

14       These RAND commitments are binding contracts between patent owners and

15 SSOs, and implementers of the standard may enforce them as third-party

16 beneficiaries. *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 884 (9th Cir. 2012)

17 (affirming that Microsoft could sue as a third-party beneficiary to enforce

18 Motorola's RAND commitments). RAND commitments serve as essential checks

19 on standard-setting's anticompetitive risks. For example, if a patent holder refuses

20 to commit to license on RAND terms, SSO rules typically require that another

21 technology be selected for the standard, or that the function covered by the patented

22 technology not be standardized at all. *See Microsoft Corp. v. Motorola, Inc.*, 864 F.

23 Supp. 2d 1023, 1032 (W.D. Wash. 2012) (SSOs routinely refuse to adopt

24 "technology into a standard unless [they] can obtain a declaration from the patent

25 holder agreeing to either license free of charge or on RAND terms"). Moreover,

26 RAND commitments protect the benefits a standard provides to consumers (*e.g.*,

27 lower costs and increased competition) by ensuring that a patent holder cannot

28

extract unreasonably high royalties by threatening injunctions after an industry has already adopted the standard. *See Microsoft*, 696 F.3d at 884.

### III.    The Accused Compression Standards.

Video coding or compression is the process of encoding a video file to reduce its size while maintaining an acceptable level of visual quality. *See* Declaration of Ketan Mayer-Patel ("Mayer-Patel Decl.") ¶ 7. An encoded video is represented as a bitstream—a sequence of bits—that can be transmitted to another device (*e.g.*, a TV or smartphone) over the internet. *Id.* ¶¶ 13-14. The other device can then decode the received encoded video bitstream to play the video. The compression process enables video streaming platforms (*e.g.*, Disney+, Netflix, and YouTube) to efficiently transmit high-quality videos over the internet. *See id.*

The ITU and its associated SSOs standardized the Compression Standards. *See id.* ¶ 9. The H.264 standard, which the ITU released in 2003, is the predominant, and therefore the most compatible, video-coding standard in current use for streaming services. *See id.* ¶ 10. The ITU released the H.265 standard around 2013 as the successor to the H.264 standard. *See id.* A variety of implementers use the H.265 standard to encode ultra-high-definition content. *See id.*

The Compression Standards specify various techniques to compress videos. *See id.* ¶ 12. One such technique is motion compensation, which involves analyzing the movement of objects in a video so that the positions of those objects can be predicted. *Id.* The accuracy of  motion compensation can be enhanced using a feature called weighted-prediction in scenes where lighting changes, fades, or gradually transitions. *Id.* ¶ 13. The weighted-prediction feature is specified in both Compression Standards, which define the process of decoding a bitstream that implements the weighted-prediction feature. *Id.* Accordingly, the Compression Standards effectively define what an encoder is required to include in a bitstream to comply with the standard's weighted-prediction feature. *Id.*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

In the Brazilian Action, InterDigital has asserted both of the Brazilian Patents against Disney+ based on its use of video compliant with the Compression Standards' weighted-prediction feature. *Id.* ¶¶ 15-23.

## IV.    InterDigital's Patents Are RAND-Encumbered.

InterDigital is a non-practicing entity headquartered in Delaware whose only business is acquiring and asserting patents. *See* Dkt. 1 ¶¶ 27, 30. InterDigital does not provide any goods or services, nor does it otherwise compete with Defendants. InterDigital did nothing to actually develop the asserted patents' underlying technology and simply purchased the patents from Technicolor and its subsidiary Thomson Licensing ("Thomson").

### A.    InterDigital and Its Predecessor-in-Interest Committed to License the Patents Asserted in this Action and in Brazil on RAND Terms.

Thomson—InterDigital's the predecessor-in-interest with regard to the patents now asserted against Defendants' use of the Compression Standards in the United States, Brazil, and Europe—committed to license any of its patents that are required to implement the Compression Standards on RAND terms, including patents asserted in this case and both Brazilian Patents.

The ITU's Common Patent Policy specified that patent holders would make commitments to license their patents on RAND terms by submitting a Declaration Form to the ITU and its associated SSOs. The ITU's Patent Policy stated:

> The Declaration Form gives Patent Holders the means of making a licensing declaration relative to rights in Patents required for implementation of a specific Recommendation | Deliverable. Specifically, by submitting this Declaration Form the submitting party declares its willingness to license (by selecting option 1 or 2 on the Form) /or its unwillingness to license (by selecting option 3 on the Form), according to the Patent Policy,

7

> Patents held by it and whose licence would be required to practice or implement part(s) or all of a specific Recommendation | Deliverable.

Declaration of Ryan Yagura ("Yagura Decl."), Ex. H.

Thomson submitted an executed Declaration Form dated June 19, 2014 identifying the H.264 standard (referred to as "ITU-Recommendation H.264") and stating:

> The Patent Holder [i.e., Thomson] believes that it holds granted and/or pending applications for Patents, the use of which would be required to implement the above document [i.e., the H.264 standard] and hereby declares, in accordance with the Common Patent Policy for ITU-T/ITU-R/ISO/IEC, that . . . :

> The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the above document.

*Id.*, Ex. D. Therefore, Thomson committed to license on RAND terms any patents it held that are required to implement the H.264 standard. In this declaration, Thompson also specifically identified the '301 Patent asserted in this action as an example of one such patent that it believed is "required to implement" the H.264 standard and that it committed to license on RAND terms. *Id.* at p. 3 (entry no. 2).[1] The two Brazilian Patents asserted in the

---

[1] Thomson also identified U.S. Patent Application Nos. PCT/2011/000856 and PCT/2011/039579—of which the '610 and '818 Patents in this case are continuations—in a similar declaration dated December 18, 2012 pertaining to the

1  Brazilian Action are foreign counterparts of the '301 Patent. *See* Mayer-
2  Patel Decl. ¶16, Exs. F-H.

3       Thomson submitted a similar declaration dated December 18, 2012
4  committing to license on RAND terms any patents it held that are required to
5  implement the H.265 standard (referred to as "ISO/IEC 23008-2 (MPEG-H,
6  Part 2)"). Yagura Decl., Ex. E. In this declaration, Thomson also specifically
7  identified the Brazilian Patents (PI0305519.1 and PI0318825.6) as examples
8  of patents it believed are "required to implement" the H.265 standard and
9  that it was committing to license on RAND terms. *Id.* at p. 17 (entry nos.
10  138 and 142).

11       Thomson's declarations bind InterDigital and obligate it to license these
12  asserted patents to any implementer of the Compression Standards—including
13  Defendants—on RAND terms. Pursuant to the ITU's intellectual property rights
14  policy, RAND commitments run with any patent once it has been declared. *Id.*,
15  Ex. C ("Licensing declarations made pursuant to Clause 2.1 or 2.2 of the Common
16  Patent Policy for ITU-T/ITU-R/ISO/IEC shall be interpreted as encumbrances that
17  bind all successors-in-interest as to the transferred Patents.").[2]

18       Therefore, both InterDigital and its predecessor-in-interest committed
19  themselves to license the asserted patents on RAND terms to implementers of the
20  Compression Standards. *See id.* Exs. C-I. "Implicit in such a sweeping promise is,

21  _____

22  H.265 standard. Yagura Decl., Ex. E. It also identified U.S. Patent No. 9,235,774,
23  of which the '818 Patent is also a continuation, in a similar declaration dated
    June 7, 2016 pertaining to the H.265 standard. *Id.*, Ex. F.

24  [2] Thomson continued submitting similar declarations to these SSOs until shortly
25  before it transferred much of its patent portfolio to InterDigital. *See, e.g.*, Yagura
    Decl., Ex. G. Moreover, after acquiring Thomson's patents in 2018, InterDigital
26  acknowledged its RAND commitments by submitting its own Patent Statement and
27  Licensing Declaration pursuant to the ITU's Patent Policy in 2020. Ex. I. In that
    declaration, InterDigital promised to offer to any willing licensee a license to any of
28  its patents essential to the H.265 standard on RAND terms. *See id.*

9

at least arguably, a guarantee that [InterDigital would] not take steps to keep would-be users from using the patented material, such as seeking an injunction, but w[ould] instead proffer licenses consistent with the commitment made." *See Microsoft*, 696 F.3d at 884 (construing ITU IPR policy to require patent holders to negotiate RAND licenses in good faith before seeking exclusionary remedies).

### B.    InterDigital Has Asserted the Patents as SEPs.

InterDigital, in addition to committing to license the asserted patents in this action and the Brazilian Patents on RAND terms, also characterized these patents as required by the Compression Standards in its infringement allegations. *See* Mayer-Patel Decl. ¶¶ 15-23. In the Brazilian Action, and for certain patents in this action, InterDigital's infringement allegations rely exclusively on the Compression Standards. *See id*. ¶¶ 15-23; Exs. C-E.

Incongruously, InterDigital simultaneously argues that "video encoding technology itself is not specified in the H.264/5 standards and thus it is not RAND encumbered." Declaration of Timothy Lee ("Lee Decl."), Ex. 2. But the '301 Patent and the Brazilian Patents ***only*** contain claims related to video encoding—and additionally InterDigital and its predecessor-in-interest specifically identified these video-encoding patents as required by the standards and promised to license them on RAND terms. *See* Mayer-Patel Decl. ¶ 16; Yagura Decl., Exs. C-I. This cannot be reconciled with InterDigital's infringement allegations in this case, which exclusively accuse essential portions of the Compression Standards. *See* Mayer-Patel Decl. ¶¶ 15-23.

Indeed, in the Brazilian Action, InterDigital's infringement allegations are solely based on parts of a video bitstream the Compression Standards specify are required to implement the accused weighted-prediction feature of the standards. Mayer-Patel Decl. ¶ 23. According to the Compression Standards, a video encoder must produce the accused parts of a video bitstream to implement the weighted-prediction feature of the standards. *Id.* InterDigital's infringement allegations in this

10

case therefore contradict its argument that the accused "video encoding technology itself is not specified in the H.264/5 standards and thus it is not RAND encumbered." Lee Decl., Ex. 2.

## V. InterDigital Breached Its Contractual Obligations by Never Offering Defendants a License on RAND Terms.

InterDigital breached its RAND licensing obligations by filing this action and the Brazilian Action, and by seeking injunctive relief in Brazil, before ever offering Defendants a license to the asserted patents on RAND terms. In July 2022, InterDigital first contacted Defendants about licensing its patent portfolio. Lee Decl. ¶¶ 4, 5. However, as confirmed by its recent correspondence, InterDigital has taken the position that it is not obligated to offer Defendants a patent license on RAND terms. *Id.* ¶¶ 5-7.

After InterDigital filed this action and the Brazilian Action, Defendants requested that InterDigital comply with its obligations and provide a RAND offer. *Id.* ¶¶ 4-6, Ex. 1. Defendants explained (i) that the patents InterDigital asserted against them based on their compliance with the Compression Standards (or the patent applications from which they issued) were previously assigned to Thomson, and (ii) that Thomson had submitted declarations to the ITU committing to "grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the [applicable H.264/AVC or H.265/HEVC standard] document[s]." *Id.*

Defendants also requested that InterDigital propose a license on RAND terms. *Id.* ¶¶ 6-7, Ex. 1. However, in response, InterDigital confirmed it is unwilling to do so. *Id.* ¶ 7, Ex. 2. InterDigital refused to provide a RAND offer and insisted that the asserted patents are "not RAND encumbered"— ignoring Thomson's and InterDigital's commitments to the ITU, and the fact that InterDigital's infringement contentions are based entirely on Defendants' compliance with the Compression Standards. *Id.*; Mayer-Patel Decl. ¶¶ 15-23.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Instead, InterDigital strategically chose to sue in Brazil because Brazilian courts adjudicate patent infringement cases on an expedited timeline and have historically permissively granted injunctive relief. *See* Barzilai Decl. ¶¶ 6-13. Based on the current timeline of the Brazilian Action, and without addressing invalidity or any of Defendants' other affirmative defenses, the Brazilian court could rule on infringement and issue an injunction as soon as June 2025. *See id.* ¶ 11.

## VI.    Enforcement of an Injunction in Brazil Would Irreparably Harm Defendants.

An injunction in Brazil would irreparably injure Defendants' Disney+ streaming platform business. Defendants encode all of the video content that they make available to their customers through Disney+ in Brazil using one or both of the Compression Standards. Declaration of Scott Labrozzi ("Labrozzi Decl.") ¶¶ 8, 10, 12. Not only would it be extremely expensive to re-encode this content to an alternative video coding, but such a change would likely cause serious service disruptions and technical problems for consumers. *Id.* ¶¶ 9-12. Therefore, a court order broadly enjoining the use of these standards in Brazil would essentially prevent Defendants from offering Disney+ in that country.

If InterDigital were to enforce such an injunction against Defendants, Defendants would likely immediately lose all of their approximately ███████ Disney+ subscribers in Brazil. Declaration of Paula Beck ("Beck Decl.") ¶ 8. Moreover, if Defendants had to discontinue Disney+ in Brazil, they would likely never regain all of their subscribers. *Id.* ¶¶ 12-17. Defendants will have lost their "early-mover" advantage in the market, and Defendants' current contracting partners in Brazil would be unlikely to work with Defendants again in the future. *Id.* ¶¶ 14-15. Defendants would likely lose over ██████ in subscription revenue alone in just the next three fiscal years from the loss of Disney+ subscribers. *Id.* ¶ 10.

12

Defendants employ over ███ people in Brazil, ███ of whom support Disney+. *Id.* ¶¶ 20-22. Should an injunction issue in Brazil, Defendants may be forced to lay off these employees. *Id.* ¶ 23. Defendants have also invested significant amounts of money and resources in developing the Disney+ brand. Since Defendants launched Disney+ in November 2019, Defendants have invested approximately ████████ worldwide in marketing, labor, and technical development toward the Disney+ brand. *Id.* ¶ 25. In Brazil alone, Defendants have invested approximately ████████ in Disney+. *Id.* Discontinuing Disney+ in Brazil would inflict serious damage on the Disney+ brand and image—both in Brazil and possibly worldwide. *Id.* ¶¶ 26-29.

Moreover, much of the content on Disney+ is particularly directed toward children, such as Defendants' popular movies The Lion King, Frozen, Cinderella, and many others. *Id.* ¶ 26. Indeed, Defendants' brand, including the Disney+ brand, is built with consumers from a very early age. *Id.* If this content were no longer available in Brazil due to an injunction against Disney+, Defendants will forever lose a positive association between children in Brazil and Defendants' brand. *Id.*

## LEGAL STANDARD

Courts may enter an injunction to preserve the status quo by enjoining a party from enforcing injunctive relief in a foreign patent infringement action. *See generally Microsoft*, 696 F.3d at 888. A court may issue such an injunction when a party's foreign litigation "frustrates the court's ability to adjudicate issues properly before it," or when "the integrity of the action before th[e] court will be lessened." *Microsoft Corp. v. Motorola, Inc.*, 871 F. Supp. 2d 1089, 1100 (W.D. Wash. 2012).

Courts have applied a three-step analytical framework, referred to as the *Gallo* requirements, to decide whether to issue such injunctions. *See generally Microsoft*, 696 F.3d at 881-88 (applying the framework laid out in *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006), and the factors in *In re Unterweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir. 1970)). First, there

13

1    are two threshold requirements: "the parties and issues must be the same in both the

2    domestic and foreign suits, and the domestic suit must be dispositive of the foreign

3    action to be enjoined." *Telefonaktiebolaget LM Ericsson v. Lenovo (United States),*

4    *Inc.*, 120 F.4th 864, 868 (Fed. Cir. 2024) ("*Lenovo*") (applying *Gallo*

5    requirements). Once the movant meets these requirements, the domestic court must

6    determine whether the movant satisfies at least one of the four "*Unterweser*"

7    factors: "whether the foreign litigation would (1) frustrate a policy of the forum

8    issuing the [anti-suit] injunction; (2) be vexatious or oppressive; (3) threaten the

9    issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings

10   prejudice other equitable consideration[s]." *Lenovo*, 120 F.4th at 869; *Microsoft*,

11   696 F.3d at 881-82. If the court concludes at least one *Unterweser* factor applies, it

12   must consider comity principles. *See Microsoft*, 696 F.3d at 881-82. As long as the

13   impact on comity is "tolerable," the court may grant an anti-suit injunction. *Id*.

14       In that same vein, "[a] preliminary injunction is not a preliminary

15   adjudication on the merits, but a device for preserving the status quo and preventing

16   the irreparable loss of rights before judgment." *See Textile Unlimited, Inc. v.*

17   *A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). "A plaintiff seeking a

18   preliminary injunction must establish that he is likely to succeed on the merits, that

19   he is likely to suffer irreparable harm in the absence of preliminary relief, that the

20   balance of equities tips in his favor, and that an injunction is in the public interest."

21   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

22                                    **ARGUMENT**

23       The Court should enjoin InterDigital from enforcing any injunction it obtains

24   in the Brazilian Action until the Court resolves Defendants' breach of RAND

25   licensing claims in this action. Defendants meet each of the *Gallo* requirements: the

26   parties and issues are the same, the domestic suit will resolve the availability of a

27   foreign injunction, at least one *Unterweser* factor applies, and a narrowly tailored

28   injunction against InterDigital by this Court will not offend principles of comity.

I.    **The Facts Weigh in Favor of a Preliminary Injunction Against Enforcement of an Injunction in Brazil.**

A.    **Defendants Meet Both Threshold Requirements.**

Because the parties to this action and the Brazilian Action are essentially the same, and because this Court's adjudication of Defendants' RAND counterclaims will fully dispose of the availability of an injunction in the Brazilian Action (should infringement ultimately be found as to the asserted Brazilian Patents), Defendants meet both of *Gallo*'s threshold requirements. *See Lenovo*, 120 F.4th at 868; *Microsoft*, 696 F.3d at 881.

1.    **The Parties and Issues in the Domestic and Foreign Suits Are the Same.**

The parties to this action and the Brazilian Action are the parent companies and affiliates of InterDigital and Defendants. *See supra* at Background Section I. Specifically, InterDigital VC Holdings, Inc.—one of the same entities that brought this case against Defendants—sued a Disney entity operating in Brazil. *See* Mayer-Patel. Decl., Ex. C. In evaluating the commonality of the parties prong, "[p]erfect identity of parties is not required." *Microsoft*, 871 F. Supp. 2d at 1098. Rather, "it suffices that the parties be affiliated in such a way that their interests coincide." *Id*. That is the case here: the parties in each action are substantially and functionally the same, and their interests coincide.

2.    **Defendants Meet *Gallo*'s "Dispositive" Requirement.**

Defendants meet the "dispositive" requirement because the resolution of Defendants' breach of RAND licensing claims in this action will dispose of the availability of injunctive relief in the Brazilian Action.

In *Microsoft*, the Ninth Circuit explained "Microsoft's contract-based claims, including its claim that the RAND commitment precludes injunctive relief, would, if decided in favor of Microsoft, determine the propriety of the enforcement by Motorola of the injunctive relief [it] obtained in Germany." 696 F.3d at 885. The

15

Court explained the domestic suit was "dispositive" of the foreign one, even though it "le[ft] Motorola free to continue litigating its German patent claims against Microsoft as to damages or other non-injunctive remedies to which it may be entitled." *Id.* at 889. Similarly, in *Lenovo*, the Federal Circuit explained Lenovo satisfied the "dispositive" requirement of the test "because (1) the [] FRAND commitment preclude[d] Ericsson from pursuing SEP-based injunctive relief unless it has first complied with the commitment's obligation to negotiate in good faith over a license to those SEPs; and (2) whether Ericsson has complied with that obligation is an issue before the district court." 120 F.4th at 878.

*Microsoft* and *Lenovo* control here. As described in Defendants' counterclaims (and in Background Section IV above), this action and the Brazilian Action involve patents encumbered by InterDigital's and Thomson's RAND promises. *See* Dkt. 42 at Counterclaims ¶¶ 32-67. In this action, Defendants contend InterDigital breached those contractual promises, and InterDigital itself acknowledges it never offered Defendants a RAND license. *See* Lee Decl., Ex. 2. That dispute is therefore squarely before this Court.

In this action, Defendants will demonstrate that InterDigital is not entitled to enforce injunctive relief on the Brazilian Patents. *See Microsoft*, 696 F.3d at 885; *Lenovo*, 120 F.4th at 876. InterDigital "entered into a [RAND] contract that affects how [it] may enforce certain of its patents," and "[w]hen that contract is enforced by a U.S. court, the U.S. court is not enforcing [foreign] patent law but, rather, the private law of the contract between the parties." *See Lenovo*, 120 F.4th at 878. And where, as here, the resolution of that contractual dispute determines the availability of injunctive relief, the "dispositive" requirement is satisfied. *See id.* at 874 n.12 (holding the "dispositive" prong satisfied by "an issue in the domestic suit that, if resolved in the antisuit-injunction movant's favor, would dictate the impropriety of a party pursuing SEP-based injunctive relief").

16

**B.** **Multiple *Unterweser* Factors Militate in Favor of Issuing an Anti-Suit Injunction.**

While Defendants must satisfy only one of the four *Unterweser* factors, Defendants satisfy at least three. InterDigital's "foreign litigation would (1) frustrate a policy of the forum issuing the [anti-suit] injunction; (2) be vexatious or oppressive," and (3) "prejudice other equitable consideration[s]." *Id.* at 869; *Microsoft*, 696 F.3d at 881-82.

**1.** **InterDigital's Enforcement of a Brazilian Injunction Will Frustrate Domestic and Public Policies.**

Allowing InterDigital to enforce a foreign injunction against Defendants in breach of its RAND commitments would frustrate specific domestic policies, including a policy against granting injunctions in cases involving SEPs when the patent holder refuses to offer a license on RAND terms. *See Huawei Techs., Co. v. Samsung Elecs. Co.*, 2018 WL 1784065, at *9 (N.D. Cal. Apr. 13, 2018) (citing cases); *Microsoft*, 696 F.3d 884 ("Implicit in such a sweeping promise [made to standards-setting organizations] is, at least arguably, a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made[.]").

U.S. courts recognize that binding RAND commitments operate to check the power patent holders acquire through standardization of their patents. *See, e.g., Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1031 (9th Cir. 2015); *Apple Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 913-14 (N.D. Ill. 2012), *aff'd in part and rev'd in part on other grounds*, 757 F.3d 1286, 1331-32 (Fed. Cir. 2014). For similar reasons, U.S. courts have repeatedly found that foreign litigation frustrates domestic policy when parties use those litigations to evade contractual obligations. *See, e.g., Huawei*, 2018 WL 1784065, at *10 ("[T]he policy that is undermined is this court's ability to determine the propriety of injunctive relief in the first

17

1    instance."); *Gallo*, 446 F.3d at 993 ("Andina's pursuit of litigation in Ecuador . . .

2    frustrates a policy of the United States courts.").

3         Defendants have repeatedly indicated their willingness to license

4    InterDigital's patents on RAND terms to avoid litigation. Lee Decl., Ex. 1. But

5    InterDigital refused—and continues to refuse—to provide any RAND license offer

6    to Defendants. *Id.*, Ex. 2. Allowing InterDigital to threaten Defendants into

7    submission by obtaining a foreign injunction would contravene these public-policy

8    interests. InterDigital voluntarily and knowingly undertook RAND commitments

9    when it purchased RAND-encumbered patents, bargaining away its right to seek an

10    injunction if it did not first offer RAND terms. This Court should issue a

11    preliminary injunction to prevent InterDigital from opportunistically breaking its

12    promises and flouting domestic (and international) policies intended to prevent such

13    abusive behavior.

14            **2.**    **InterDigital's Foreign Injunction Actions Are Vexatious and**

15                   **Oppressive.**

16         This case presents a clear example of vexatious and oppressive conduct in the

17    form of InterDigital's attempt to impose "inequitable hardship" through use of a

18    foreign injunction, satisfying another *Unterweser* factor.

19         In connection with RAND-licensing disputes, "[foreign] injunctions w[ill]

20    likely force [the putative licensee] to accept [the patentee's] licensing terms, before

21    any court has an opportunity to adjudicate the parties' breach of contract claims."

22    *Huawei*, 2018 WL 1784065, at *10. In *Microsoft*, the Ninth Circuit affirmed that

23    foreign litigation was vexatious where it amounted to "a procedural maneuver

24    designed to harass Microsoft with the threat of an injunction removing its products

25    from a significant European market." 696 F.3d at 886. The court explained the

26    foreign injunction action "compromise[d] [its] ability to reach a just result in the

27    case before it free of external pressure on Microsoft to enter into a 'holdup'

28    settlement before the litigation is complete." *Id.*

InterDigital's Brazilian Action creates the same threat of "inequitable hardship." InterDigital's objective is transparent—it seeks to acquire and exert leverage that it would gain from obtaining a Brazilian injunction on patents it has asserted as essential to the Compression Standards, and then coerce Defendants into paying supra-RAND royalties. *See* Mayer-Patel Decl. ¶¶ 15-23; *Microsoft*, 696 F.3d at 886. It does not even attempt to conceal that improper goal. Lee Decl., Ex. 2. It is engaging in exactly the type of abusive and opportunistic patent hold-up that SSOs seek to prevent. *See Microsoft*, 696 F.3d at 886.

Furthermore, because all of Defendants' allegedly infringing acts—content encoding for Defendants' streaming platforms— ██████████████████ ████, this Court provides the proper forum for resolving this dispute, not Brazil. Labrozzi Decl. ¶ 7. InterDigital chose Brazil for the same reasons Motorola chose Germany in *Microsoft*: the availability of permissive injunctive relief and the opportunity to shut Defendants out of a significant market. Unlike Motorola, InterDigital does not stand to derive *any* legitimate benefit from excluding Disney+ from Brazil. As a non-practicing entity, InterDigital does not compete with Defendant in the streaming market, and ultimately wants Defendants to pay it money for a license. *See* Lee Decl., Exs. 1-2. That makes InterDigital's Brazilian Action an even more obvious example of vexatious and oppressive foreign litigation than Motorola's attempted hold-up in *Microsoft*. The Court should hold this *Unterweser* factor satisfied as well.

### 3. The Balance of Equities Tips Decisively in Defendants' Favor.

Absent a preliminary injunction, Defendants will suffer irreparable harm if a Brazilian court enjoins them from offering Disney+ in Brazil. As Background Section VI lays out, an injunction in Brazil would threaten a shutdown of Disney+ in that country. *See* Beck Decl. ¶ 3. Because Defendants would likely lose *all* of their Disney+ subscribers, an injunction could result in Defendants losing the

19

1    entirety of their market share—amounting to over ███████ just in the next

2    three years—in Brazil. *Id.* ¶¶ 6-11. *See Conceptus, Inc. v. Hologic, Inc*., 2012 WL

3    44064, at *2 (N.D. Cal. Jan. 9, 2012) (holding that loss of market share and loss of

4    customers and access to potential customers may qualify as irreparable harm).

5         An injunction would also significantly damage Disney+'s brand and image.

6    Beck Decl. ¶¶ 24-29. The loss of customer goodwill and attendant brand damage

7    also qualify as irreparable injuries. *Cadence Design Sys., Inc. v. Avant! Corp*., 125

8    F.3d 824, 828 (9th Cir. 1997) (issuing an injunction because evidence of irreparable

9    harm in the form of "lost sales and [plaintiff's] inability to reposition itself as a

10   service-oriented company" could not be rebutted simply by observing that such

11   commercial injuries "seem[ed] to be quantifiable"); *Stuhlbarg Int'l Sales Co. v.

12   John D. Brush & Co*., 240 F.3d 832, 841 (9th Cir. 2001) (noting that the

13   "threatened loss of prospective customers or goodwill [certainly] supports a finding

14   of the possibility of irreparable harm"); *eBay, Inc. v. Bidder's Edge, Inc*., 100 F.

15   Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost

16   customer goodwill is irreparable because it is neither easily calculable, nor easily

17   compensable and is therefore an appropriate basis for injunctive relief."). Nor

18   would the harm from a Brazilian injunction stop with Defendants—it would ripple

19   outwards to Defendants' Brazilian employees, facilities, and local partners.

20        Ultimately, the balance of equities favors Defendants because InterDigital

21   seeks to use a foreign injunction and the threat of irreparable harm to Defendants'

22   business operations and reputation to coerce excessive royalties in violation of its

23   RAND commitments. In contrast, InterDigital stands to suffer little prejudice if this

24   Court issues an anti-suit injunction. InterDigital derives no commercial benefit

25   from excluding Defendants' Disney+ streaming platform from Brazil because

26   InterDigital and Defendants do not compete in the streaming market; InterDigital

27   simply wants (more) money. *See Apple*, 869 F. Supp. 2d at 914 ("By committing to

28   license its patents on FRAND terms, Motorola committed to license the [SEP] to

anyone willing to pay a FRAND royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent.").

Because this remedy has no impact on InterDigital's ability to seek monetary damages in Brazil or in any other jurisdiction, and because Defendants would suffer irreparable harm without it, Defendants satisfy this *Unterweser* factor.

### C. The Proposed Injunction Will Not Offend Principles of Comity.

Defendants satisfy the final step in the *Gallo* analysis because the proposed injunction's "impact on comity is tolerable." *See Lenovo*, 120 F.4th at 886. As the *Lenovo* court explained, *Gallo's* "particular phrasing is instructive. [It] requires not that [the court] calculate the precise quantum of the injunction's interference with comity, but only that [it] estimate whether any such interference is so great as to be intolerable." *Id.* The *Gallo* threshold is not a strict one, and it calls for an inquiry that is both "flexible, [and] fact- and context-specific." *Id.* Factors that inform that inquiry include (i) whether the litigants are private parties in a contractual dispute versus a dispute implicating public international law or government litigants, (ii) the timing of the foreign and domestic actions, and (iii) the scope of the requested injunction. *Id.* The anti-suit injunction Defendants seek will not adversely impact comity in any of these ways.

*First*, "comity is less likely to be threatened in the context of a private contractual dispute than in a dispute implicating public international law or government litigants." *Microsoft*, 696 F.3d at 887; *see also Huawei*, 2018 WL 178406, at *12; *Gallo*, 446 F.3d at 994. This dispute involves contractual RAND commitments that Thomson voluntarily entered into in return for its participation in the standard-setting process, and that InterDigital voluntarily undertook as a condition of its acquisition of RAND-encumbered patents. This dispute does not implicate public international law and the parties are all private entities.

*Second*, InterDigital's numerous actions are actually targeted at Defendants' encoding process— ██████████████████████████████. Labrozzi

Decl. ¶ 7. This global dispute is also between two parties headquartered in the United States, not Brazil. Dkt. 1 ¶¶ 5, 9. The Brazilian Patents are also foreign counterparts of the '301 Patent asserted in this action. Under these circumstances, preventing InterDigital from enforcing any injunctive relief during the pendency of this action would not impinge on the Brazilian court.

*Third*, Defendants seek a narrow preliminary injunction to prevent InterDigital from enforcing a Brazilian injunction it might obtain on an expedited basis only until this Court can adjudicate Defendants' breach of RAND licensing claims. Courts have recognized that "[t]he scope of the anti-suit injunction is another factor relevant to the comity inquiry," and "[c]omity teaches that the sweep of the injunction should be no broader than necessary to avoid the harm on which the injunction is predicated." *Id.* Here, the proposed injunction is limited in scope temporally, geographically, and substantively. *See Microsoft*, 696 F.3d at 888 (affirming an anti-suit injunction that is tailored, directed specifically to the parties, and limited in time). InterDigital would remain free to proceed to a determination on the merits of the claims it brought in Brazil—Defendants only ask that they not be enjoined from providing their services there while this Court adjudicates the merits of their RAND counterclaims.

Restraining InterDigital from enforcing an exclusionary remedy during pendency of this case will not offend the relations between foreign and domestic courts. Indeed, this Court would not be the first to issue such injunctions to resolve a RAND licensing dispute. *Microsoft*, 696 F.3d at 887; *Huawei*, 2018 WL 178406, at *12. The injunctions in those cases did not trample upon comity principles, and this one would not either.

## II.    A Preliminary Injunction Is Proper.

For many of the same reasons already discussed above, a preliminary injunction temporarily preventing InterDigital from enforcing an injunction in Brazil is warranted here. *See Winter*, 555 U.S. at 20.

22

*First*, Defendants are likely to succeed on the merits in establishing InterDigital is obligated to grant Defendants a license to InterDigital's asserted patents on RAND terms. As laid out in Background Section IV, InterDigital and its predecessor-in-interest previously submitted declarations committing to license its patents (or related patents and/or applications) on RAND terms to any implementer of the Compression Standards. As several courts have already ruled, InterDigital's RAND commitments to the ITU are binding contractual obligations, and Defendants are a third-party beneficiary entitled to enforce those obligations. *See Microsoft*, 696 F.3d at 884. Thus, because Defendants have a high likelihood of establishing they are entitled to a RAND license, preliminary relief is appropriate.

*Second*, as described in Background Section VI, Defendants are likely to suffer irreparable harm absent preliminary relief. Specifically, an injunction in Brazil would threaten a shutdown of Disney+ there, which would result in the loss of all Disney+ subscribers and over ▮▮▮▮▮▮▮ over the next few years. *See* Beck Decl. ¶¶ 6-11. Moreover, the Brazilian court could issue an injunction as soon as June 2025. Barzilai Decl. ¶ 11.

*Third*, as discussed above in Argument Section I.B.3, the balance of equities favors Defendants. Defendants ask this Court to grant temporary relief to preserve the status quo just long enough to decide whether InterDigital must provide a license on RAND terms. Temporarily delaying any injunction in Brazil while this Court addresses that issue carries no risk to InterDigital, which does not compete in the streaming market. In contrast, Defendants stand to lose their entire market share in Brazil.

*Finally*, a preliminary injunction would be in the public interest because, if the public is to receive the benefits of standardization, patent owners must grant the promised licenses and on terms that do not hold the entire market hostage. Courts have recognized that industry standards benefit consumers by, for example, "facilitat[ing] the sharing of information among purchasers of products from

23

competing manufacturers" and consequently "enhancing the utility of all products," "enlarging the overall consumer market," "enhancing competition," and "lower[ing] the cost to consumers." *Broadcom*, 501 F.3d at 308-09. But allowing InterDigital to avoid its RAND obligations undermines the foundation of trust and cooperation required to develop such standards. *See id.* at 313. Companies rely on RAND obligations as an important safeguard when deciding whether to invest in developing products and services that use standards. *Id.* Thus, unless courts enforce such obligations, companies will be less incentivized to make such investments and the public will ultimately be harmed.

## CONCLUSION

Defendants request that this Court issue a preliminary injunction enjoining InterDigital from enforcing any injunction it obtains in the Brazilian Action until this Court determines if InterDigital breached its RAND licensing obligations.

DATED: April 24, 2025                         Respectfully submitted,


By:   */s/ Ryan K. Yagura*
                                                              Ryan K. Yagura

RYAN K. YAGURA
NICHOLAS J. WHILT
XIN-YI ZHOU
O'MELVENY & MYERS LLP

*Attorneys for Defendants The Walt Disney Company, Disney Media and Entertainment Distribution LLC, Disney DTC LLC, Disney Streaming Services LLC, Disney Entertainment & Sports LLC, Disney Platform Distribution, Inc., BAMTech LLC, Hulu, LLC, and ESPN, Inc.*

24

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,993 words, which complies with the word limit of L.R. 11-6.1.

Date:  April 24, 2025                              */s/ Ryan K. Yagura*
                                                          Ryan K. Yagura

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 24, 2025, a true and correct copy of the foregoing document was served on all counsel of record via electronic mail.

DATED: April 24, 2025      By: _/s/ Ryan K. Yagura_

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION