Richard A. Kamprath (admitted *pro hac vice*)
rkamprath@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Nancy Olson (SBN 260303)
nsolson@olsonstein.com
David Stein (SBN 198256)
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane, #301
Newport Beach, CA 92663
Telephone: (310) 916-7433

*Additional Counsel on signature block
Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISON**

| INTERDIGITAL, INC., *et al.,* | ) | **Case No. 2:25-cv-00895-WLH-BFM** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF** |
| | ) | |
| THE WALT DISNEY COMPANY, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | Judge: Hon. Wesley L. Hsu |
| | ) | Courtroom: 9B |
| | ) | Hearing Date: TBD |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

*McKool Smith, P.C.
Los Angeles, CA*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    LEGAL STANDARDS........................................................................... 1

III.   LEVEL OF ORDINARY SKILL IN THE ART........................................ 2

IV.    U.S. PATENT NO. 8,406,301 ............................................................... 3

       A.    "weighting factor" (claims 8, 10) ...................................... 3

       B.    "assigning a second weighting factor for the image block corresponding to a second reference picture index corresponding to a second reference image picture" (claim 10)................................ 5

       C.    "the substantially uncompressed image block" (claim 10).................. 8

V.     U.S. PATENT NO. 10,805,610 ............................................................. 11

       A.    "intra prediction for at least one of the pixels within the second group is obtained by using pixels from neighboring pixels within the first group of pixels in blocks already coded and neighboring pixels outside the block that have already been coded" (claim 6)..... 11

VI.    U.S. Patent No. 9,185,268 ................................................................. 14

       A.    "reference type display having a reference color gamut" (Claims 1, 6, 7, 8, 11)................................................................................. 14

       B.    "non-reference type display having a nonreference color gamut" (Claims 1, 6, 8, 11)........................................................................ 15

       C.    "at least one of a nonreference type display having a non-reference color gamut and a reference type display having a reference color gamut" (Claims 1, 6)............................................................. 17

VII.   U.S. Patent No. 8,085,297 ................................................................. 19

       A.    "side information components for modifying a functionality of said user interface" (Claim 1)............................................................. 19

       B.    "modifying a way in which said user can provide input into said user interface by using said stored side information components" (Claim 1)........................................................................................ 21

i

McKool Smith, P.C.
Los Angeles, CA

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017) ............................................................... 5

*Clearstream Wastewater Systs, Inc. v. Hydro-Action, Inc.*,
    206 F.3d 1440 (Fed. Cir. 2000) ............................................................... 3

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012) ............................................................. 11

*Embrex, Inc. v. Serv. Eng'g Corp.*,
    216 F.3d 1343 (Fed. Cir. 2000) ............................................................... 1

*Firtiva Corp. v. Funimation Glob. Grp., LLC*,
    No. 2:21-cv-00111-JRG-RSP, 2022 WL 23165 (E.D. Tex. January 3,
    2022) ....................................................................................................... 18

*Fujifilm Corp. v. Motorola Mobility LLC*,
    No. 12–cv–03587–WHO, 2015 WL 1265009 (N.D. Cal. Mar. 19,
    2015) ................................................................................................... 18, 19

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014) ............................................................... 4

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ............................................................... 2

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ............................................................... 2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ............................................................................. 2, 5

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ............................................................. 18

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................... 2, 8, 19

McKool Smith, P.C.
Los Angeles, CA

*Radware Ltd. v. A10 Networks, Inc.*,
  No. C–13–2021 RMW, 2014 WL 1572644 (N.D. Cal. Apr. 18, 2014)............ 18

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
  No. 19-005 (MN), 2020 WL 2128795 (D. Del. May 5, 2020) ...................17, 18

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ................................................................. 19

*Rodime PLC v. Seagate Tech., Inc.*,
  174 F.3d 1294 (Fed. Cir. 1999) ................................................................. 20

*U.S. Surgical Corp. v. Ethicon Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ................................................................... 1

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................1, 2

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ................................................................. 20

**Statutes**

35 U.S.C. §112(6) .....................................................................................19, 20, 21

McKool Smith, P.C.
Los Angeles, CA

P'S OP. CLAIM CONST. BR.

1

## TABLE OF PLAINTIFFS' EXHIBITS

| Exhibits | Description | Citation |
|---|---|---|
| A | Declaration of Pierre Moulin, D.Sc., dated July 11, 2025 | Page 1-43 |
| B | Deposition Transcript of Dr. Ketan Mayer-Patel, taken August 7, 2025 | Page 44-67 |
| C | Declaration of Dr. Ketan Mayer-Patel in Support of Defendants' Claim Constructions | Page 68-229 |
| D | Deposition Transcript of Pierre Moulin, D. Sc., taken August 8, 2025 | Page 230-271 |
| E | Declaration of Michael Sprenger, Ph.D., dated July 11, 2025 | Page 272-326 |
| F | Supplemental Declaration of Michael Sprenger, Ph.D., dated July 29, 2025 | Page 327-334 |

McKool Smith, P.C.
Los Angeles, CA

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

P'S OP. CLAIM CONST. BR.

# I.    INTRODUCTION

InterDigital asserts that Defendants (collectively, "Disney") are infringing five of InterDigital's U.S. Patents. These patents claim inventions that enable and improve the ability for consumers to obtain and watch streaming video. During claim construction, the Court defines, as a matter of law, what certain disputed terms in the patent claims mean. Here, there are nine such terms.

The purpose of claim construction is to "understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (internal quotations omitted). InterDigital has proposed constructions that adhere to the controlling legal principals and the record in this case. Disney has not. Disney's constructions are divorced from the intrinsic and extrinsic sources of meaning, attempt to "read in" extraneous limitations to alter the meaning of the claims, and manufacture non-existent issues (that its own expert contradicts).

Disney argues that four terms cannot be defined at all—a doctrine called indefiniteness, which Disney must prove by clear and convincing evidence. It cannot do so in view of the evidence. Because InterDigital's constructions adhere to the patents and tenets of claim construction, and Disney's litigation-induced constructions invite error, the Court should adopt InterDigital's constructions.

# II.    LEGAL STANDARDS

## A. Claim Construction

"Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). To begin, courts consider the intrinsic evidence, which includes the patent claims, specification, and prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The "claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim

1

the [patented] subject matter." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal quotations omitted). The claim terms must be read in light of the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Vitronics*, 90 F.3d at 1582 ("[T]he specification 'is always highly relevant … Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'")).

After looking at the intrinsic evidence, courts may consider extrinsic evidence, including inventor and expert testimony, dictionaries, and treatises. *Phillips*, 415 F.3d at 1317. But, extrinsic evidence is "less significant than the intrinsic record" because it is generally "less reliable." *Id.* at 1317-18. Although expert testimony may be useful in some circumstances, courts will "discount any expert testimony that is clearly at odds with [the intrinsic evidence] of the patent," as well as expert testimony that is conclusory or unsupported. *Id.* at 1319 (internal quotations omitted).

## B. Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A]n accused infringer [must] show[] by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). "Proof of indefiniteness requires such an exacting standard because claim construction often poses a difficult task over which expert witnesses, trial courts, and even the judges of this court may disagree." *Id.* at 1249.

## III.  LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") would have a bachelor's degree in computer or electrical engineering or a related field along with: (a) two plus years of

P'S OP. CLAIM CONST. BR.

McKool Smith, P.C.
Los Angeles, CA

practical experience with technologies related to video coding for the '301 and '610 patents; (b) two years of experience with technologies related to color correction systems for the '268 patent; and (c) one year of experience with technologies related to user interfaces for the '297 patent. A higher level of education may substitute for a lesser level of practical experience, or vice-versa. Ex. A (Moulin Decl.) at ¶32; Ex. E (Sprenger Decl.) at ¶¶22-23.

## IV.    U.S. PATENT NO. 8,406,301

### A. "weighting factor" (claims 8, 10)

| InterDigital's Construction | Disney's Construction |
|---|---|
| a scaling value | a coefficient for a multiplication operation that scales a value |

The parties agree that a weighting factor is a scaling value that <u>can be</u> used in a multiplication operation. The parties disagree whether the weighting factor <u>must always be</u> used in a multiplication operation. Contrary to Disney's assertion, the '301 patent explains that a "weighting factor" can be used to scale in ways other than by multiplication.

For example, Claim 8 specifies that the "weighting factor" is used for "modifying," which is different from and broader than multiplying. *Compare* '301 patent at claim 8 (the "assigned weighting factor" is used to "<u>modify</u>[] the motion compensated reference picture.") (emphasis added) *with id.* at claim 5 ("A video encoder as defined in claim 4, further comprising a <u>multiplier</u> … for applying a weighting factor[.]") (emphasis added) and claim 10 ("<u>multiplying</u> the motion compensated second reference picture by the assigned second weighting factor [.]") (emphasis added). Under the doctrine of claim differentiation, "it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims." *Clearstream Wastewater Systs, Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000). Thus, "modifying ... by an assigned weighting factor" in

3

independent claim 8 is necessarily broader than "multiplying the motion compensated second reference picture by the assigned second weighting factor," in dependent claim 10.

Even where some of the '301 patent's embodiments disclosed using a weighting factor only in a multiplication operation, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (internal quotations omitted). Disney fails to identify any indication, let alone a clear indication, that the patentee intended to narrow the claims in this way.

The '301 Patent explains that when two different reference pictures are used to predict a block of pixels, such as in biprediction, the two predictions can be averaged together using equal weighting factors of 1/2 for each. '301 Patent at 1:37-51. A POSITA understands that averaging two numbers can be accomplished by scaling both using a weighting factor of 1/2 and then taking their sum. *Id.*; Ex. A (Moulin Decl.) at ¶48.[1] A weighting factor of 1/2 could be implemented by multiplying the reference picture by 0.5 or by dividing the reference picture by 2. In either scenario, the weighting factor scales the reference picture by 1/2—regardless of whether a multiplication or division occurs.

Disney's construction is incorrect because the patent does not limit how the weighting factor modification is implemented in claim 8—only that it is used to modify the reference picture by, for example, averaging. The '301 patent also describes a weighting factor of -1. *Id.* at 3:7-22. Scaling by a weight of -1 could be implemented by multiplying by -1 or by adding a negative sign to the prediction—either meets the claim language of "modifying the motion compensated reference picture by the

---

[1] Disney did not provide any expert testimony regarding the term "weighting factor."

P'S OP. CLAIM CONST. BR.

McKool Smith, P.C.
Los Angeles, CA

assigned weighting factor." InterDigital's construction is the only one before the Court that remains faithful both to the patent and to the law of claim interpretation.

**B. "assigning a second weighting factor for the image block corresponding to a second reference picture index corresponding to a second reference image picture" (claim 10)**

| InterDigital's Construction | Disney's Construction |
|---|---|
| assigning a second weighting factor for the image block wherein the second weighting factor and a second reference picture correspond to a second reference picture index | Indefinite |

The Court should adopt InterDigital's construction, which adheres to the plain and ordinary meaning and makes the term easier for the fact-finder to understand. Disney appears to agree that InterDigital's construction could be correct, but stretches to claim it is not reasonably certain. This is insufficient to demonstrate indefiniteness.

Disney has the burden to prove indefiniteness by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Patent claims must be written so that their limits can be understood by a POSITA "with reasonable certainty." *Nautilus, Inc. v. Biosig Instr., Inc.*, 572 U.S. 898, 910 (2014). "Reasonable certainty does not require absolute or mathematical precision." *BASF*, 875 F.3d at 1365 (internal quotations omitted).

Disney's manufactured ambiguity is contradicted by the intrinsic and extrinsic evidence—including its own expert's testimony. Disney cannot meet its burden to show indefiniteness because a POSITA would understand with reasonable certainty that this term recites a second weighting factor and a second reference picture, both of which correspond to the second reference picture index. Ex. A (Moulin Decl.) at ¶52; Ex. B (Disney Expert Mayer-Patel Depo.) at 32:8-12.

McKool Smith, P.C.
Los Angeles, CA

First, the claims of the '301 patent support InterDigital's construction and refute Disney's indefiniteness assertion. Claim 8 recites: "assigning a weighting factor for the image block, the weighting factor being associated with a particular reference picture index, wherein the particular reference picture index is for independently indicating, without use of another index, a particular reference picture." '301 patent claim 8. In claim 8, (a) the weighting factor is associated with a reference picture index and (b) the reference picture index indicates a reference picture[2]:



Claim 10 recites the same relationship between the weighting factor, reference picture index, and the reference picture: "assigning a second weighting factor for the image block corresponding to a second reference picture index corresponding to a second reference image picture." *Id.* at claim 10. Claim 10 and claim 8 recite the same structure: the weighting factor corresponds to the reference picture index which corresponds to the reference picture.

Second, the specification also supports InterDigital's construction. During bi-prediction, two reference pictures are used to form predictions, which are combined. *See id.* at 2:64-3:1. Because each bi-predictively coded block can be predicted from different reference pictures, two lists—list 0 and list 1—are maintained, both of which both include reference pictures. *Id.* at 3:1-10. Weighting factors can also be associated with the reference pictures in list 0 and list 1. *Id.* at 8:20-26, 8:29-34, 8:42-52.

---

[2] This figure was created based on the '301 patent, but does not appear in the patent.

P'S OP. CLAIM CONST. BR.

McKool Smith, P.C.
Los Angeles, CA

McKool Smith, P.C.
Los Angeles, CA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The '301 Patent provides an example where Pred0 is formed using a reference picture in list 0 and a corresponding weighting factor, W0, is used to modify the prediction. *Id.* at 8:20-26. A POSITA would understand that the reference index for each list (*i.e.*, ref_idx_l0 and ref_idx_l1) is used to access both (i) a reference picture and (ii) the corresponding weighting factor to be used with that picture. *See id.*; Ex. A (Moulin Decl.) at ¶54. Thus, the specification plainly teaches a reference picture and weighting factor both corresponding to a reference picture index.

The experts agree with InterDigital's construction. Disney's expert Dr. Mayer-Patel agreed that a POSITA would understand both a weighting factor and a reference picture are associated with a reference picture index in this context:

> Q. So the weighting factor is associated with the reference picture index, and, of course, the reference picture is also associated with the reference picture index; correct?
>
> A. That is correct.

Ex. B (Mayer-Patel Depo.) at 32:8-12; *see also* Ex. C (Mayer-Patel Decl.) at ¶37 (agreeing that a POSITA would find "the 'second weighting factor' that is 'corresponding to a second reference picture index corresponding to a second reference picture' to be "reasonably plausible"); Ex. A (Moulin Decl.) at ¶52.

Disregarding all of the intrinsic and extrinsic evidence, Disney argues this term is indefinite because a POSITA supposedly cannot determine whether it is: (1) the "image block" or (2) the "second weighting factor" that is "corresponding to a second reference picture index corresponding to a second reference picture."[3] Disney cannot meet the high burden to prove indefiniteness, and its strawman argument is contradicted by the evidence including its expert's testimony.

Disney's expert Dr. Mayer-Patel could not identify any disclosures in the '301 patent that support Disney's indefiniteness assertion that the "image block"

---

[3] Disney's proposal (2) is the same understanding that InterDigital has of the term.

"correspond[s] to a second reference picture index corresponding to a second reference picture". Ex. B (Mayer-Patel Depo.) at 32:17-24; 35:13-23; 36:9-14. Instead, Dr. Mayer-Patel testified that the specification does not disclose any embodiments in which the reference picture index is used to identify the image block:

> Q. [S]o far as you've described the '301 patent in your declaration, there is no embodiment where the -- a reference picture index is used to identify an image block?
>
> A. That is true. There's no embodiment described that way.

*Id.* at 36:9-14. Dr. Mayer-Patel testified his "image block" opinion was limited to an analysis of the claims <u>without any analysis</u> of the patent's written description or figures. *Id.* at 36:22-25; 37:4-8; *see* Ex. C (Mayer-Patel Decl.) at ¶38 (Dr. Meyer-Patel's only opinion regarding an image block allegedly corresponding to a reference picture index). Because there is neither claim nor specification support for Disney's contrived "image block" proposal, it is not a reasonable understanding of the term, and Disney has failed to meet its burden to prove that the term is indefinite—and certainly not clearly and convincingly. *See Phillips*, 415 F.3d at 1319 (holding that a court should "discount any expert testimony 'that is clearly at odds with [the intrinsic evidence] of the patent'").

## C. "the substantially uncompressed image block" (claim 10)

| InterDigital's Construction | Disney's Construction |
| --- | --- |
| the image block | Indefinite |

This term should be construed as "the image block" which a POSITA would understand with reasonable certainty. Disney's position is undermined by the evidence, including its own expert's testimony, and Disney cannot show the term is indefinite by clear and convincing evidence.

McKool Smith, P.C.
Los Angeles, CA

P'S OP. CLAIM CONST. BR.

First, the claims of the '301 patent support InterDigital's construction. Claim 8, from which Claim 10 depends, recites "receiving an uncompressed image block" which throughout the claim references interchangeably as "the image block" and "the uncompressed image block." *See* '301 patent at Claims 8, 10. Likewise, claim 10 recites steps performed in relation to "the image block" and "the substantially uncompressed image block." *See id.* The image blocks terms in claims 8 and 10 refer to the same structure. A POSITA would understand that these claims describe successive processes that are performed on an image block to ultimately compress it. Ex. A (Moulin Decl.) at ¶56; Ex. B (Mayer-Patel Depo.) at 41:9-14.

Second, the specification supports InterDigital's proposal—and Disney's expert agrees. Ex. B (Mayer-Patel Depo.) at 41:9-19. Figure 7 depicts a flowchart for an encoding process that operates according to the principals taught in the '301 patent. '301 patent at Fig. 7 & 6:63-66. Step 712 says "receive uncompr image block"[4] and step 722 says "subtract weighted motion compensated reference picture from uncompressed image." Ex. B (Mayer-Patel Depo.) at 40:6-8. The specification describing Figure 7 explains "input block 712 receives substantially uncompressed image block data." *See id.* at 41:6-8. Disney's expert Dr. Mayer-Patel agreed that the uncompressed image block and the substantially uncompressed image block refer to *the same image block* throughout the patent:

> Q. When you wrote your declaration, were you aware that the patent used uncompressed image block in Figure 7 and substantially uncompressed image block in column 6 to refer to the same thing?
>
> A. I see that those do refer to the same thing, yes.
>
> Q. When you wrote your declaration, were you aware of that?
>
> A. I believe I was -- I would be, yes.
>
> Q. But you didn't discuss it in your declaration?

---

[4] The word "uncompr" is truncated in block 712.

P'S OP. CLAIM CONST. BR.

1    A. I did not discuss it.

2    *Id.* at 41:9-19. Because the intrinsic evidence shows the substantially uncompressed

3    image block, uncompressed image block, and image block of claims 8 and 10 refer to

4    the same image block, a point on which both experts agree, the Court should adopt

5    InterDigital's construction.

6         Each of Disney's three indefiniteness arguments fails. First, Disney argues a

7    POSITA would not have reasonable certainty whether "the substantially uncompressed

8    image block" is referring to (1) the "uncompressed image block" as received in claim

9    8 or (2) the uncompressed image block after it has undergone some compression in

10   claim 8 that would make the image block "substantially uncompressed." Second,

11   Disney argues a POSITA would have understood there must be some difference in

12   scope between an "uncompressed image block" and a "substantially uncompressed

13   image block."

14        Taking these argument together, Disney's positions distort the claim language

15   and ignore the specification. Disney identifies no evidence of a compressed image block

16   in claim 8. Disney's expert admits the image block, uncompressed image block, and

17   substantially uncompressed image block refer to the same thing. *Id.*; *see also id.* at

18   39:24-40:3 (agreeing that the image block input to the subtraction operation block 510

19   of Figure 5 is uncompressed and there are no other subtraction operations where the

20   image block is partially compressed); *accord* Ex. A (Moulin Decl.) at ¶58. That the

21   specification does not disclose a partially compressed image block further supports the

22   conclusion that uncompressed and substantially uncompressed refer to the same image

23   block from claim 8. *See also* Ex. D (Moulin Depo. at 145:5-18).

24        Third, Disney argues the '301 Patent fails to disclose how much compression

25   must be applied to an "uncompressed image block" for it to become "substantially"

26   uncompressed. The Federal Circuit "has repeatedly confirmed that relative terms such

27   as 'substantially' do not render patent claims so unclear as to prevent a person of skill

28   in the art from ascertaining the scope of the claim." *Deere & Co. v. Bush Hog, LLC,*

McKool Smith, P.C.
Los Angeles, CA

10

703 F.3d 1349, 1359 (Fed. Cir. 2012). Beyond this, Disney's expert admits the '301 patent has no description or embodiments where a "partially compressed image block" is input into a subtraction operation. Ex. B (Mayer-Patel Depo.) at 39:24-40:3 (agreeing no image block is partially compressed); 38:19-22 (same); 38:5-14 (subtraction operation on uncompressed image block); 40:19-25 (same); 41:1-19 (same). Disney cannot meet its burden to prove indefiniteness where the image blocks in claims 8 and 10 refer to the same structure, and a POSITA would understand that these claims describe successive processes that are performed on an image block to ultimately compress it. *Id.* at 41:9-14; Ex. A (Moulin Decl.) at ¶56.

## V.    U.S. PATENT NO. 10,805,610

### A. "intra prediction for at least one of the pixels within the second group is obtained by using pixels from neighboring pixels within the first group of pixels in blocks already coded and neighboring pixels outside the block that have already been coded" (claim 6)

| InterDigital's Construction | Disney's Construction |
|---|---|
| determining at least one pixel in the second group using already coded pixels within the first group and outside the block | Indefinite |

The Court should adopt InterDigital's construction, which adheres to the plain meaning. Disney again argues indefiniteness, which is undermined by the intrinsic evidence and its expert's testimony. Disney cannot show indefiniteness by clear and convincing evidence.

The patent claims support InterDigital's construction. The first limitation of claim 6 recites "encoding a block in a picture using intra prediction by dividing pixels within the block into at least a first group and a second group and predicting pixels in the first group from neighboring pixels outside the block, prior to encoding the pixels in the second group[.]" '610 patent claim 6. Stated differently, pixels in a first group in

11

McKool Smith, P.C.
Los Angeles, CA

a block are predicted from neighboring pixels outside the block prior to encoding the pixels in the second group. Disney's expert agrees this limitation is not indefinite. Ex. B (Mayer-Patel Depo.) at 44:8-11.

Figure 7 depicts a grouping of pixels within a block according to an embodiment of the '610 patent:



FIG. 7

700

1. A Block (Blue and Yellow Together)
2. First Group (Crosshatched Yellow)
3. Second Group (Uncrosshatched Blue)
4. Neighboring Pixels Outside the Block (Crosshatched Green)

'610 patent at Figure 7 (color and descriptions added). Disney's expert agrees that a "block" from claim 6 can be mapped to the rectangular array of pixels including the uncrosshatched blue and crosshatched yellow pixels, but not the crosshatched green pixels. Ex. B (Mayer-Patel Depo.) at 45:12-20. A "first group" in the block from claim 6 maps to the yellow crosshatched pixels and the "second group" in the block from claim 6 maps to the blue uncrosshatched pixels. *Id.* at 45:21-46:14. Neighboring pixels outside the block are highlighted green (the leftmost column and top row). *Id.* at 45:1-5.

Mapping Figure 7 to claim 6, with Dr. Mayer-Patel's agreed color scheme, clearly shows <u>how</u> and <u>when</u> the intra prediction in both the first and second limitations

McKool Smith, P.C.
Los Angeles, CA

are performed:

| Claim Limitation 6(a) | Claim Limitation 6(b) | InterDigital's Proposed Construction |
|---|---|---|
| encoding a block in a picture using intra prediction by dividing pixels within the block into at least a first group and a second group and predicting pixels in the first group from neighboring pixels outside the block, *prior to encoding the pixels in the second group,* | wherein an intra prediction for at least one of the pixels within the second group is obtained by using pixels from neighboring pixels within the first group of pixels in blocks already coded and neighboring pixels outside the block that have already been coded, and | determining at least one pixel in the second group using already coded pixels within the first group and outside the block |

'610 patent at claim 6 (emphasis added); *cf.* Figure 7; Ex. B (Mayer-Patel Depo.) at 44:2-46:14.

Once the first group of pixels is encoded in 6(a), that first group of now-<u>encoded</u> pixels and other neighboring <u>encoded</u> pixels outside the block are used to encode the second group of pixels in 6(b). *See* '301 patent at claim 6(a) (first group of pixels encoded "prior to encoding the pixels in the second group.").

This understanding comports with the prosecution history: Disney's expert Dr. Mayer-Patel agrees that "the Applicant was intentional in drafting the claim language to specify that the first- group pixels used for second-group pixel prediction must be located 'in blocks already encoded.'" Ex. C (Mayer-Patel Decl.) at ¶60 (color added) (citing '610 File History, February 5, 2020 Amendment and Response, at 3, 7).

Disney argues the claim language requires that "the first group" of pixels reside both within the block currently being encoded but also "in blocks already coded." This is non-sensical. In step 6(a), the first group of pixels are "encod[ed] in a picture using intra prediction," which happens "prior to encoding the pixels in the second group." Then, in step 6(b), the second group of pixels are encoded using intra prediction based on the first group of pixels that were encoded in step 6(a). Dr. Mayer-Patel agreed the '610 patent does not disclose any embodiments where the first group of pixels [Yellow]

McKool Smith, P.C.
Los Angeles, CA

recited in the first limitation of claim 6 is part of the neighboring pixels outside of the block [Green]:

> Q. In terms, again, of the colorized version of Figure 7 in Exhibit 4, does the patent, anywhere in its written description or figures, disclose an embodiment in which the yellow pixels in the first group are part of the green pixels of the neighboring pixels outside of the block?
>
> A. Again, I don't believe any such embodiment is described there.

Ex. B (Mayer-Patel Depo.) at 46:15-47:11; *see also* Ex. D (Moulin Depo.) at 136:17-137:5 (explaining plain meaning of the term). Disney cannot meet its burden to prove indefiniteness by clear and convincing evidence because its arguments lack intrinsic support and are contradicted by its own expert.

## VI.    U.S. PATENT NO. 9,185,268

### A. "reference type display having a reference color gamut" (Claims 1, 6, 7, 8, 11)

| InterDigital's Construction | Disney's Construction |
| --- | --- |
| display capable of accurately displaying colors in accordance with a standardized color gamut | a display that supports a standardized color gamut |

Generally speaking, a color gamut is the range of colors that a specific device can produce.[5] The reference type display term requires <u>using</u> the reference color gamut to accurately display colors, as InterDigital contends, as opposed to merely <u>supporting</u> a reference color gamut while potentially using another gamut, as Disney contends. *See* Ex. B (Mayer-Patel Depo.) at 74:3-23. A monitor that supports a standardized gamut would satisfy Disney's construction <u>even when using a different</u>, <u>non-standardized gamut for color correction</u> (*see id*. at 74:3-8), a result that finds no support in the patent

---

[5] *See* InterDigital's forthcoming technology tutorial for further description of color gamuts.

McKool Smith, P.C.
Los Angeles, CA

and is contrary to the goal of the patent—ensuring "predictable results on displays with different color gamuts." '268 Patent at 1:11-14. Ensuring "predictable results on displays with different color gamuts is important because of "significant variation in the color gamuts used in various displays currently available" and "the range of colors capable of being displayed depends on the display technology used and the hardware design." *Id.* at 2:50-55.

To provide predictable results, both the color correcting display and playback display must actually use, not merely support, the same color gamut. If, for example, color correction were performed assuming that one of the displays used a supported standardized gamut when, in fact, the display used a different, non-standardized gamut,[6] the resulting colors would be mismatched during playback. "When editing the colors of a picture on a display with a reference color gamut other than the color gamut of the target display, the resultant colors may look dissatisfying on the target display." *Id.* at 1:26-30 (emphasis added); *see also id.* at 4:7-11, 4:21-27 (discussing incorrect color reproduction due to gamut mismatch). Under InterDigital's construction, the reference type and playback displays display colors similarly, leading to predictable color reproduction.

The intrinsic evidence shows that claimed reference type displays *use* a reference color gamut and the reference color gamut is chosen. Construing the term to admit mere capability to support a reference color gamut that is different from the gamut actually used would undermine an important object of the patented invention.

### B. "non-reference type display having a nonreference color gamut" (Claims 1, 6, 8, 11)

| InterDigital's Construction | Disney's Construction |
|---|---|
| display capable of displaying colors in accordance with a color gamut other than the reference color gamut | a display that does not support a standardized color gamut |

---

[6] The display in this example would satisfy Disney's, but not InterDigital's, construction.

P'S OP. CLAIM CONST. BR.

A non-reference color gamut is a color gamut other than the reference color gamut (*i.e.*, color gamut different than the reference color gamut). The parties' dispute here mirrors the dispute for the prior term.

The plain and ordinary meaning of "non-reference color gamut" is a color gamut that is not the reference color gamut. For example, if the reference color gamut were the Rec. 709 standardized color gamut,[7] then the <u>non</u>-reference color gamut would be a <u>non</u>-Rec. 709 gamut. The specification supports this reading and imposes no requirement that a non-reference gamut not be standardized. *See e.g.,* '268 Patent at 7:13-18. What the patent does require is that the claimed non-reference type display (called "CG2 display" in the written description[8]) use a color gamut <u>different from</u> the color gamut used by the reference-type display. *Id.* Contrary to Disney's proposal, whether the non-reference type display uses or supports a color gamut that is standardized is of no moment. *Id.* ("[T]he phrase 'RCG displays' refers to displays having a gamut type denoted as a reference color gamut (RCG), while the phrase 'CG2 displays' refers to displays having a gamut type denoted as a second color gamut, <u>the second color gamut being different than the reference color gamut</u>." (emphasis added)).

Every exemplary embodiment refers to an RCG (reference) display and a CG2 (non-reference) display, without regard to whether the gamut of the CG2 display is standardized. '268 Patent at 8:42-67, 9:6-49, 9:57-10:37, 10:43-11:10, 11:19-29. Whether the gamut of the non-reference type display is standardized simply does not matter; it is unrelated to the nature and purpose of the invention. *Id.* Conversely, as in InterDigital's construction, the gamut of the CG2 display must be <u>different from</u> the reference color gamut to further the patent's aim of "color correcting to provide

---

[7] The Rec. 709 color gamut is an exemplary standardized color gamut discussed in the patent. '268 Patent at 1:15-25.

[8] Both parties' experts agree that the claimed "non-reference type displays" correspond to the "CG2 displays" described in the patent's written description. Ex. E (Sprenger Decl.) at ¶55; Ex. B (Mayer-Patel Depo.) at 52:9-16.

McKool Smith, P.C.
Los Angeles, CA

predictable results on displays with <u>different</u> color gamuts." '268 Patent at 1:11-14 (emphasis added).

### C. "at least one of a nonreference type display having a non-reference color gamut and a reference type display having a reference color gamut" (Claims 1, 6)

| InterDigital's Construction | Disney's Construction |
|---|---|
| Plain and ordinary meaning: one or both of a display capable of accurately displaying colors in accordance with a standardized color gamut and a display capable of displaying colors in accordance with a color gamut other than the reference color gamut. | at least one of each category of displays selected from category (1) a non-reference type display having a nonreference color gamut and category (2) a reference type display having a reference color gamut |

The parties disagree whether "at least one of… and…" is disjunctive or conjunctive. The claims, specification, and grammatical rules show disjunctive use. This term's use of "at least one of" is satisfied by a single reference type display, a single non-reference type display, <u>or</u> both types of displays.[9]

Courts have previously held that "at least one of" is disjunctive when followed by two items as opposed to a list of three or more items. *Rex Med., L.P. v. Intuitive Surgical, Inc.*, No. 19-005 (MN), 2020 WL 2128795, at *6 (D. Del. May 5, 2020) ("Here, 'at least one of' is not modifying a list of three items, but only two. Where there are only two items, courts have understood the use of 'and' to operate as a shorthand for '[A] or [B] or [A and B].'"); *Radware Ltd. v. A10 Networks, Inc.*, No. C–13–2021

---

[9] Disney's constructions are nonsensical when combined. Disney's expert testified that a display implementing both a reference and non-reference color gamut is a reference type display. Ex. B (Mayer-Patel Depo.) at 74:3-23. If two such monitors are used, then there is no non-reference type display even though two monitors can display the reference color gamut and non-reference color gamut. *See Dealertrack, Inc. v. Huber*, CV 06-2335 AG (FMOx), 2008 WL 5792509 at *7 (C.D. Cal. September 27, 2008) (adopting disjunctive construction where "to construe this claim as 'at least one of [A], at least one of [B], and at least one of [C]' would not make sense.").

P'S OP. CLAIM CONST. BR.

McKool Smith, P.C.
Los Angeles, CA

McKool Smith, P.C.
Los Angeles, CA

1  RMW, 2014 WL 1572644, at *6-7 (N.D. Cal. Apr. 18, 2014). Consistent with this
2  authority, two items follow "at least one of": (i) a non-reference type display; and (ii) a
3  reference type display. '268 Patent at Claims 1, 6. This is disjunctive.

4      Further, a conjunctive reading renders "at least one of" superfluous, which
5  supports disjunctive use. *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12–cv–03587–
6  WHO, 2015 WL 1265009, at *7-8 (N.D. Cal. Mar. 19, 2015) ("Motorola's [rejected]
7  construction of 'at least one of' would effectively read the term out of the 'menu
8  comprising' limitation."); *Radware*, 2014 WL 1572644 at *7; *Rex*, 2020 WL 2128795
9  at *6. If read conjunctively, the claim reads the same with and without "at least one of."

10     Multiple exemplary embodiments use a single display for content creation.
11  Courts find a disjunctive construction when embodiments fail to require all items
12  proceeding "at least one of." *Firtiva Corp. v. Funimation Glob. Grp., LLC*, No. 2:21-
13  cv-00111-JRG-RSP, 2022 WL 23165, at *7 (E.D. Tex. January 3, 2022) (rejecting
14  conjunctive construction of "at least one of" followed by a five-item list where "at least
15  two disclosed embodiments do not require all of the information types listed in [the
16  disputed] term"); *Rex*, 2020 WL 2128795 at *7.

17     Figure 7's example requires only an "RCG display 782, using CG2 simulation
18  via a CGM module 786," for content creation. '268 Patent at 10:18-20. "Alternatively
19  or in addition, a CG2 display may be used on the content creation side." *Id*. at 10:20-
20  22. Figure 8's embodiment requires only an RCG display for content creation. *Id*. at
21  10:64-65. The embodiments function using a reference type display, a non-reference
22  type display, or both. "At leas[t] where claims can reasonably [be] interpreted to include
23  a specific embodiment, it is incorrect to construe the claims to exclude that
24  embodiment, absent probative evidence on the contrary." *Oatey Co. v. IPS Corp.*, 514
25  F.3d 1271, 1276–77 (Fed. Cir. 2008)**.**

26     The structure "at least one of… and…" is disjunctive in other claims. Claim 2
27  requires "metadata is provided… at least one of in-band and out-of-band…." '268
28  Patent at Cl. 2. Mutually exclusive definitions for in-band and out-of-band show

18

disjunctive use:

> [T]he phrase "in-band" refers to the transmitting and/or receiving of such metadata together with the color corrected picture content[.] In contrast, the phrase "out-of-band" refers to the transmitting and/or receiving of the metadata separately with respect to the color corrected picture content.

*Id*. at 7:30-37. Claim 5 requires "the reference type displays and the non-reference type displays are at least one of" a list of display technologies. *Id*. at claim 5. However, the patent teaches a display uses only one of these display technologies. *Id*. at 1:60-2:1. "[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *Phillips*, 415 F.3d at 1314; *Fujifilm*, 2015 WL 1265009 at *9 (finding "at least one of" followed by a list disjunctive where used disjunctively in other portions of claim). Based on the claims and specification, a disjunctive construction is appropriate.

## VII.   U.S. Patent No. 8,085,297

### A. "side information components for modifying a functionality of said user interface" (Claim 1)

| InterDigital's Construction | Disney's Construction |
| --- | --- |
| Plain and ordinary meaning | Means-plus-function under 35 U.S.C. § 112, ¶ 6<br><br>Function: modifying a functionality of the user interface<br><br>Structure: Indefinite |

Disney does not contend that this term should be given its plain and ordinary meaning, only that it is a means-plus-function term that is indefinite for lack of corresponding structure. Disney is incorrect; the term does not invoke §112, ¶6 and

McKool Smith, P.C.
Los Angeles, CA

therefore no corresponding structure is required.[10] The claim does not use the word "means," so a presumption against means-plus-function claiming applies. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348-49 (Fed. Cir. 2015). More fundamentally, as both parties' experts agree, "side information components" are data incapable of performing any function, including modifying the functionality of a user interface. Ex. F (Sprenger Supp. Decl.) at ¶7; Ex. B (Mayer-Patel Depo.) at 81:2-17. The "component" used in the claim is not referring to a physical "component" but rather to a piece of data corresponding to the "side information."

A claim term, like this one, that does not recite a function to be performed does not invoke section 112, ¶6: "[A] claim element that uses the word 'means' but recites no function corresponding to the means does not invoke § 112, ¶ 6." *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999). As Disney's expert agreed, the alleged function Disney identifies—i.e., "modifying the functionality of said user interface"—is not a function that the "side information components" can perform:

> Q. And as data, side information components themselves, do not and, in
> fact, are not capable of modifying the functionality of the user interface.
> Do you agree?
> A. So just data, no.

Ex. B (Mayer-Patel Depo.) at 81:13-17.

The term appears in the limitation "<u>receiving</u> side information comprising side information components for modifying a functionality of said user interface and validity information…." '297 Patent, claim 1. Notably, the "side information components" are received without any modification occurring. Ex. F (Sprenger Supp. Decl.) at ¶¶8-9. Rather than performing a function, the claim requires "side information components"

---

[10] Under 35 U.S.C. §112(6), a term may be claimed as "a means or step for performing a specified function without the recital of structure, material, or acts in support thereof," but if that is how it is described, "such claim shall be construed to cover [only] the corresponding structure, material, or acts described in the specification and equivalents thereof." (now renumbered as § 112(f)).

P'S OP. CLAIM CONST. BR.

to be <u>stored</u> and then <u>used</u> to "modify[] a way in which said user can provide input into said user interface <u>by using said stored side information components</u>." *Id.* at ¶9. "Side information components" therefore perform no function—they are acted upon when received, stored, and used in modification. *Id.* at ¶¶9-12. This comports with the side information components being mere data, not physical structure.

In one embodiment, "[t]he side information components and validity information must be received, extracted, and stored before any user interface modification occurs." *Id.* at ¶10; '297 Patent at 2:9-10, 2:36-41. "[A] second buffer 9, a modification unit 10 and a control unit 11 are implemented for the purpose of modifying the UI according to the invention." '297 Patent at 2:33-36. Modification is not performed by "side information components." Ex. F (Sprenger Supp. Decl.) at ¶11. Instead, "user interface modification is performed by a modification unit 10, second buffer 9, and control unit 11 using side information components and validity information that are fed to modification unit 10." *Id.*; '297 Patent at 2:41-45; Ex. B (Mayer-Patel Depo.) at 77:19-23.

"Side information components" are not actors; they are acted upon—being received, stored, and used to modify the user interface—but perform no function themselves. *Id.* Because there is no recited function corresponding to the disputed term, Disney cannot meet its burden to show that §112, ¶6 applies or that the claim is indefinite. The term should be construed in accordance with its plain and ordinary meaning.

**B. "modifying a way in which said user can provide input into said user interface by using said stored side information components" (Claim 1)**

| InterDigital's Construction | Disney's Construction |
|---|---|
| Plain and ordinary meaning | modifying the way in which the user can input commands or operations into said user interface (e.g. changing from "pushing a displayed button" to "uttering the respective keyword") by using the stored side information components |

McKool Smith, P.C.
Los Angeles, CA

Disney's construction improperly limits the claim scope with an unnecessary example that the jury might understand to narrow "modifying <u>a way in which said user can provide input</u>" to "modifying <u>the input mechanism</u>," *e.g.*, switching from button input (first input mechanism) to voice input (second input mechanism). Any such narrowing would be improper, as it would exclude changing the way in which a single input mechanism (e.g., button or voice) is used to provide input. *See, e.g.,* '297 Patent at 2:60-67 (new voice command is added to voice input user interface).

Disney's example is not taken from the intrinsic evidence. It instead improperly combines two distinct embodiments, a button input embodiment and a voice input embodiment, to suggest that the claim somehow relates to changes in the input mechanism. '297 Patent at 3:11-25. Nowhere is a switch from button input to voice input disclosed or required. *Id*.

Contrary to Disney's example, the specification discloses embodiments that modify the way users can provide input without requiring a change in the input mechanism. The '297 patent discloses "television viewers are asked to vote in order to determine the winner of the game show." *Id*. at 3:10-15. Keywords (*e.g.*, blue team, red team, yellow team) are assigned to the candidates. *Id*. at 3:15-18. "These keywords… can appear as a table in a user-callable menu <u>or</u> can be added to the vocabulary of the speech recognition unit." *Id*. at 3:18-21 (emphasis added). To vote, "[t]he user can then select one of the teams by pushing a displayed button <u>or</u> by uttering the respective keyword." *Id*. at 3:21-25 (emphasis added). The "displayed button" is a modified way in which the user can provide input because it is a new button with new functionality (and only provided for the period of the validity information as discussed in the claim).

The Court should reject Disney's proposed example, which finds no support in the patent and is likely to mislead the jury into believing the claim requires changing from one input mechanism to another. It does not, and this claim term should be understood according to its plain and ordinary meaning.

McKool Smith, P.C.
Los Angeles, CA

P'S OP. CLAIM CONST. BR.

Dated: August 22, 2025

Respectfully submitted,

*/s/ Richard A. Kamprath*
Alan P. Block (CA Bar No. 143783)
ablock@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Richard A. Kamprath *(admitted pro hac vice)*
rkamprath@mckoolsmith.com
Alexandra Easley *(admitted pro hac vice)*
aeasley@mckoolsmith.com
R. Arden Seavers *(admitted pro hac vice)*
aseavers@mckoolsmith.com
Samuel L. Moore *(admitted pro hac vice)*
smoore@mckoolsmith.com
Joseph W. Micheli *(admitted pro hac vice)*
jmicheli@mckoolsmith.com
Daniel Iliasevitch *(admitted pro hac vice)*
diliasevitch@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Joshua W. Budwin *(admitted pro hac vice)*
jbudwin@mckoolsmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, Texas 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

Kevin Burgess *(admitted pro hac vice)*
kburgess@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, Texas 75670

McKool Smith, P.C.
Los Angeles, CA

Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Hannah Mirzoeff *(admitted pro hac vice)*
hmirzoeff@mckoolsmith.com
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

*Attorneys for Plaintiffs InterDigital, Inc.,
InterDigital VC Holdings, Inc., InterDigital
Madison Patent Holdings, SAS, and InterDigital
CE Patent Holdings, SAS*

P'S OP. CLAIM CONST. BR.

## <u>CERTIFICATE OF COMPLAINCE</u>

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,799 words, which complies with the word limit set by Court Order dated February, 6, 2025.

Dated: August 22, 2025                    */s/ Richard A. Kamprath*
                                          Richard A. Kamprath

P'S OP. CLAIM CONST. BR.