UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

INTERDIGITAL, INC.,
INTERDIGITAL VC HOLDINGS,
INC., INTERDIGITAL MADISON
PATENT HOLDINGS, SAS, AND
INTERDIGITAL CE PATENT
HOLDINGS, SAS,

Plaintiffs,

v.

THE WALT DISNEY COMPANY,
DISNEY MEDIA AND
ENTERTAINMENT DISTRIBUTION
LLC, DISNEY DTC LLC, DISNEY
STREAMING SERVICES LLC,
DISNEY ENTERTAINMENT &
SPORTS LLC, DISNEY PLATFORM
DISTRIBUTION, INC., BAMTECH,
LLC, HULU, LLC, AND ESPN, INC.,

Defendants.

Case No. 2:25-cv-00895-WLH-BFM

**ORDER RE CLAIM CONSTRUCTION**

The Court is in receipt of the parties' Joint Claim Construction and Prehearing Statement and related briefing, which outline the terms with agreed upon constructions and those that remain in dispute. (Joint Brief, Dkt. No. 100). The Court held a claim construction hearing on October 24, 2025. The Court construes the disputed terms as stated herein.

## I.    BACKGROUND

Plaintiffs in this case are InterDigital, Inc., InterDigital VC Holdings, Inc., InterDigital Madison Patent Holdings, SAS, and InterDigital CE Patent Holdings, SAS (collectively, "InterDigital").  Defendants include Walt Disney Company, Disney Media and Entertainment Distribution LLC, Disney DTC LLC; Disney Streaming Services LLC, Disney Entertainment & Sports LLC, Disney Platform Distribution, Inc.; BAMTech, LLC, Hulu, LLC, and ESPN, Inc. (collectively, "Disney"). (Complaint ("Compl."), Dkt. No. 1).

InterDigital alleges that Disney infringed, and continues to infringe, on five patents relating to video coding:  U.S. Patent No. 8,406,301 for Adaptive Weighting of Reference Pictures in Video Encoding ("the '301 Patent"), U.S. Patent No. 10,805,610 for "Methods and Systems for Intra Coding a Block having Pixels Assigned to Groups ("the '610 Patent"), U.S. Patent No. 11,381,818 for Methods and Apparatus for Determining Quantization Parameter Predictors from a Plurality of Neighboring Quantization Parameters ("the '818 Patent"), U.S. Patent No. 9,185,268 for Methods and Systems for Displays with Chromatic Correction with Differing Chromatic Ranges ("the '268 Patent"), and U.S. Patent No. 8,085,297 for Method for Modifying a User Interface of a Consumer Electronic Apparatus, Corresponding Apparatus, Signal and Data Carrier ("the '297 Patent") (collectively, the "Asserted Patents").  (Compl. ¶ 1, Exs. A.1-E.1).  InterDigital claims that the streaming services Disney+, Hulu, Hulu Live, and ESPN+ (the "Accused Instrumentalities") "collectively infringe the Asserted Patents." (*Id.* ¶ 39).  Disney counterclaims that (1) InterDigital breached its contractual obligation to offer Disney licenses to the '301, '610 and '818 Patents and related international patents on reasonable and non-discriminatory ("RAND") terms and conditions, and (2) that the Asserted Patents are invalid for failing to meet the conditions for patentability.  (*See generally* Answer and Counterclaims, Dkt. No. 42).

2

The case has now reached the claim construction stage.  The parties have filed their opening and responsive claim construction briefs.  (Defendants' Opening Brief, Dkt. No. 102; Plaintiffs' Opening Brief, Dkt. No. 103; Defendants' Responsive Brief, Dkt. No 108; Plaintiff's Responsive Brief, Dkt. No. 110).  The parties' Joint Claim Construction and Prehearing Statement outlines the terms with agreed upon constructions and those that remain in dispute.  (Joint Brief, Dkt. No. 100).

### 1. The '301 Patent

InterDigital alleges that Disney infringes at least one method claim of the '301 Patent (including at least Claims 8-12) through its encoding of the content to the Accused Instrumentalities.  (Compl. ¶ 483).  The '301 Patent "concerns video encoders and encoding methods where a reference picture weighting factor is associated with a particular reference picture index."  (*Id.* ¶ 472).  In particular, the patent utilizes "adaptive weighting" of reference pictures, where the "weighting factor adapts for individual motion blocks within a picture, based on the reference picture index that is used for that motion block."  (*Id.* ¶ 474).  The below block diagram in Figure 5 illustrates a video encoder's utilization of reference picture weighting.  (*Id.* ¶ 475).  InterDigital asserts that a "person of ordinary skill in the art reading the '301 Patent and its claims would understand that the Patent's disclosure and claims are drawn to solving specific, technical problems arising in video coding systems/methods and provide for advancements in the field that were not routine, well-understood or conventional."  (*Id.* ¶ 479).

//
//
//
//
//
//
//

3



FIG. 5

### 2. The '610 Patent

InterDigital alleges that Disney infringes at least one method claim of the '610 Patent (including at least Claims 6-10) through its encoding of the content to the Accused Instrumentalities. (Compl. ¶ 503). The '610 Patent is "generally directed to video coding, and in particular intra coding a block having pixels assigned to groups" to improve efficiency in video coding. (Compl. ¶ 491). Figure 8 below illustrates an exemplary video encoder. "For the first group of pixels, the encoder generates the prediction based on neighboring encoded pixels using the DC/plane prediction method or some directional prediction methods, and then calculates the prediction residue." Then, "[t]he reconstructed pixels are [] considered together with the pixels in the neighboring blocks that are already encoded to predict pixels in the second group." (*Id.* ¶ 494).

//

//

//

//

//

4

//



FIG. 8

InterDigital asserts that a "person of ordinary skill in the art reading the '610 Patent and its claims would understand that the Patent's disclosure and claims are drawn to solving specific, technical problems arising in video coding systems/methods and provide for advancements in the field that were not routine, well-understood or conventional." (*Id.* ¶ 499).

### 3. The '268 Patent

InterDigital alleges that Disney infringes at least one method claim of the '268 Patent (including at least Claims 1-11) through its encoding of the content to the Accused Instrumentalities. (Compl. ¶ 545). The '268 Patent aims to address video color correction issues on devices that do not support industry-standard color gamuts.

5

(*Id.* ¶ 527). In those cases, "[w]hen editing the colors of a picture on a display with a reference color gamut other than the color gamut of the target display, the resultant colors may look dissatisfying on the target display." (*Id.*). The color correction workflow—one of many in the '268 Patent—to "obtain a master for CG2 displays and one master for RCG displays" is illustrated in Figure 8 below.



FIG. 8

InterDigital asserts that a "person of ordinary skill in the art reading the '268 Patent and its claims would understand that the Patent's disclosure and claims are drawn to solving specific, technical problems arising in video transmission of improved dynamic color range systems/methods and provide for advancements in the field that were not routine, well-understood or conventional." (*Id.* ¶ 541).

### 4. The '297 Patent

InterDigital alleges that Disney infringes at least one method claim of the '297 Patent (including at least Claims 1-12) through its encoding of the content to the Accused Instrumentalities. (Compl. ¶ 565). Specifically, the '297 Patent "disclose[s] a method for modifying a user interface ["UI"] of a consumer electronic apparatus, which can be used for example to update a given basic UI functionality or to temporarily implement isolated, dedicated UI subdomains." (*Id.* ¶ 555). Figure 1

below depicts a "block diagram of an embodiment of the present invention." (*Id.*). After a signal "consisting of main data and embedded side information" is received, the side information is separated, and the main data is forwarded to "suited processing means 2, e.g. an MPEG-2 decoder" for playback. (*Id.*).  "The side information can [then] be used to modify the visual appearance of the UI, e.g. to insert additional buttons with a new functionality or to create new subdirectories with additional commands." (*Id.* ¶ 558).

FIG. 1

InterDigital asserts that "a person of ordinary skill in the art reading the '297 Patent and its claims would understand that the Patent's disclosure and claims are drawn to solving specific, technical problems arising in video transmission graphical user interface systems/methods and provide for advancements in the field that were not routine, well-understood or conventional." (*Id.* ¶ 561).

## II.    LEGAL STANDARD

### A.    Claim Construction

Claim construction is an interpretive issue "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  It is "a question of law in the way that we treat document construction as a question of law." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325–29 (2015).  The claim

language itself is the best guide to the meaning of a claim term.  *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014).  This is because the claims define the scope of the claimed invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  But a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent."  *Id.* at 1313.  Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis."  *Id.* at 1315 (internal quotation marks omitted).

Although claims are read in light of the specification, limitations from the specification must not be imported into the claims.  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).  "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."  *Phillips*, 415 F.3d at 1323.  The prosecution history may lack the clarity of the specification, but it is "another established source of intrinsic evidence."  *Vederi*, 744 F.3d at 1382.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  *Phillips*, 415 F.3d at 1317 (citation omitted).  "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent."  *Id.*  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*  Claim construction usually involves resolving disputes about the "ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312–13 (internal quotation marks and citations omitted).  But in some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean something else.  "[A] claim term may be clearly redefined without an

explicit statement of redefinition," so long as a person of skill in the art can ascertain the definition by reading the patent documents. *Id.* at 1320 (alteration in original); *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.,* 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotation marks omitted). Sometimes, the use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate legal question of the significance of the facts to the construction "in the context of the specific patent claim under review." *Teva*, 574 U.S. at 319, 332. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

## B. Indefiniteness

A patent's specification must conclude "with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b); *see also* 35 U.S.C. § 112 ¶ 2 (2006). To meet this "definiteness" requirement, "a patent's claims, viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.* ("*Nautilus I*"), 572 U.S. 898, 910 (2014). The Supreme Court in *Nautilus I* emphasized that patents must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them," while

recognizing that absolute precision is unobtainable given "the inherent limitations of language." *Id.* at 899, 910 (quoting *Markman*, 517 U.S. at 373) (alteration in original).  General claim construction principles apply to indefiniteness challenges, but the burdens are different.  *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010) ("In the face of an allegation of indefiniteness, general principles of claim construction apply.") (internal quotation marks and citations omitted) (citation modified).  Although courts construing claim language sit in relative equipoise, a patent is "presumed valid under 35 U.S.C. § 282." *Biosig Instruments, Inc. v. Nautilus, Inc.* ("*Nautilus II*"), 783 F.3d 1374, 1377 (Fed. Cir. 2015).  "[C]onsistent with that principle, a fact finder is instructed to evaluate . . . whether an invalidity defense has been proved by clear and convincing evidence." *Id.* (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 111 (2011)) (emphasis added and brackets removed) (omission in original); *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007) ("Because a patent is presumed to be valid, the evidentiary burden . . . is one of clear and convincing evidence.").

## III.    DISCUSSION

### A. Undisputed Claim Terms

The parties agree that the term "side information" in the '297 Patent (Claims 1-3, 10-12) should be construed as "information other than main data (e.g., other than audiovisual data, pure visual data, pure audio data)."  (Joint Br. at 2).  The parties additionally agree that the term "validity information" in the '297 Patent (Claims 1, 10) should be construed as "information controlling a start time and/or an end time of a user interface modification."  (*Id.*).  The Court accepts the parties' agreed constructions, and these constructions will bind them.  *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377–78 (Fed. Cir. 2007) (rejecting appellate challenge to claim construction agreed to by the parties in district court).

## B. Disputed Claim Terms

The Court now turns to those terms whose constructions remain in dispute.

### 1. "weighting factor" – '301 Patent (Claims 8, 10)

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| a scaling value | a coefficient for a multiplication operation that scales a value |

The parties primarily dispute whether "weighting factor" in Claims 8 and 10 of the '301 Patent represents a multiplier (in Disney's view), or a value that serves to modify a value (a reference picture, as one example) in some way (in InterDigital's view). (Defs.' Opening Br. at 4-5; Pltfs.' Opening Br. at 3-4).

Plaintiffs curiously decline to cite any prosecution history to support their argument that the use of "modify" in Claim 8 versus that of "multiply" in Claims 5 and 10 necessarily differentiates the use of the term "weighting factor"—and warrants the broader construction of "scaling value." The Patent itself, at various junctures, references a multiplying effect of the weighting factors. First, to illustrate the interaction between reference picture predictions and the weighting factors, the Patent offers the following equation:

$$Pred=[(P0)(Pred0)]+[(P1)(Pred1)]+D$$

('301 Patent at 3:10-16). For purposes of the calculation, P0 and P1, the weighting factors, serve as multipliers of the reference picture predictions, Pred0 and Pred1. (*Id.*). The same multiplier effect of the "weighting factor" is depicted in another of the Patent's demonstratives. (*See id.* at 8:20-28 (Pred=$W0$*Pred0+D0 where W0 is the weighting factor)). Second, the Patent's description of the embodiment in Figure 2 states that "[a] first output of the lookup **280** is for providing a weighting factor, and is connected in signal communication to a second input of the *multiplier* **270**." (*Id.* at 4:60-62) (emphasis added).

11

Moreover, when the coding transmittal does not include weighting factors, "default weights" are used, such as ½. (*Id.* at 7:50-54). In the Court's view, these defaults indicate that the weighting factor is in fact a coefficient, as Disney argues. The fact that all of the embodiments and examples provided in the specification show the multiplier effect of the "weighting factor" further supports this conclusion. *See Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) ("wound" means "skin wound" where all examples in patent involve skin wounds). InterDigital attempts to rely on the singular use of the term "modify" in the claim—and ignore the plentiful references to "multiplier" throughout the Patent '301—to impermissibly expand the language of Claim 8 and 10. Because the "context in which a term is used in the asserted claim can be highly instructive," *Phillips*, 415 F.3d at 1314, the Court finds in favor of Disney's construction.[1] That finding is bolstered by the extrinsic evidence presented—namely that "factor" in a technical sense is most often defined as an operand or multiplier in multiplication. (*See, e.g.*, Defs. Opening Br. Ex. 6 (IEEE Dictionary) at DIS448-0010217; Ex. 7 (Computer Dictionary) at DIS448-0010220).

> 2. *"assigning a second weighting factor for the image block corresponding to a second reference picture index corresponding to a second reference picture"* – *'301 Patent  (Claim 10)*

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| assigning a second weighting factor for the image block wherein the second weighting factor and a second reference picture correspond to a second reference picture index | Indefinite |

---

[1] At oral argument, InterDigital was unable to proffer a persuasive justification for the Court to disregard the context of the claim generally. The patentee relied on the multiplier effect of this scaling value in several parts of the specification. The Court cannot turn its head to that intrinsic evidence.

12

Disney contends that this term in Claim 10 of the '301 Patent is indefinite because a person of ordinary skill in the art ("POSITA") "would not have been able to choose among multiple plausible interpretations."  (Defs. Opening Br. at 6).  More specifically, Disney cites two plausible interpretations: one where the "*image block*" corresponds to a "second reference picture index" that corresponds to a "second reference picture," and another where the "*second weighting factor*" corresponds to the "second reference picture index" that corresponds to a "second reference picture." (*Id.* at 6-7).

When disputing a claim term on indefiniteness grounds, the challenging party must adduce clear and convincing evidence "[b]ecause a patent is presumed to be valid."  *Young,* 492 F.3d at 1345.  InterDigital argues that Disney fails to meet this evidentiary burden.  (Pltfs. Opening Br. at 5).  In its opening brief, InterDigital relies on the language in Claim 8[2] to exemplify the relationship between the weighting factor, reference picture index and the reference picture.  It goes on to propound a figure illustrating such a relationship.  (*See* Pltfs. Opening Br. at 6).  However, if this were so clear from the plain language of Claim 10 itself, InterDigital need not have engaged in such an artistic endeavor.  Rather, such a figure supports the inference that the relationship is not evident from the Patent's text and prosecution history. Defendants' expert, Dr. Ketan Mayer-Patel, convincingly attests that the "patentee chose to use a different language for claim 10, which would be understood by a POSITA to mean that the assignment and association of the second weighting factor recited in claim 10 is different from that of the weighting factor first recited in claim 8." (Declaration of Dr. Ketan Mayer-Patel ("Mayer-Patel Decl."), Dkt. No. 102-2 ¶ 38).  If the patentee sought to mirror the same language it used in Claim 8, it

---

[2] Claim 8 describes the relationship as, "assigning a weighting factor for the image block, the weighting factor being associated with a particular reference picture index, wherein the particular reference picture index is for independently indicating, without use of another index, a particular reference picture." ('301 Patent at 10:16-20).

could have easily done so in the patent drafting process. Because the claim term as it currently stands "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention," *Nautilus I*, 572 U.S. at 901, the Court finds this term in Claim 10 is invalid as indefinite.

        3. *"the substantially uncompressed image block" – Patent '301 (Claim 10)*

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| the image block | Indefinite |

The parties dispute whether the qualifier of "substantially uncompressed" in this claim term renders it indefinite. Disney argues that Plaintiffs seek to impermissibly delete an "undefined term of degree." (Defs. Opening Br. at 8-9). Plaintiffs maintain that this term is interchangeable with "image block" and merely serves to describe the "successive processes that are performed on an image block to ultimately compress it." (Pltfs. Opening Br. at 9). Figure 7 in the '310 Patent illustrates this process of receiving a "substantially uncompressed image block" and its subsequent manipulation via weighting factors and comparisons to reference pictures. ('310 Patent at 1:65-2:4).

After considering the claim language, the written description and prosecution history, the Court ultimately finds the term to refer to the same "image block" used throughout the '310 Patent. It does not appear that InterDigital sought to distinguish this term from others used to describe the processed image block as a means to differentiate prior art. Disney's expert also conceded this fact, asserting in deposition that "uncompressed image block," and "substantially uncompressed image block" refer to the same "image block." Deposition of Dr. Ketan Mayer-Patel ("Mayer-Patel Tr."), Dkt. No. 103-2 at 41:1-19). Accordingly, Disney does not set forth clear and

convincing evidence that the use of "substantially" in this term "render[s] [it] so unclear as to prevent a person of skill in the art from ascertaining the scope of the claim." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012). At the same time, InterDigital's construction improperly omits language from the patent claim. The Court opts instead to adopt the plain and ordinary construction of "substantially uncompressed image block."

4. "*intra prediction for at least one of the pixels within the second group is obtained by using pixels from neighboring pixels within the first group of pixels in blocks already coded and neighboring pixels outside the block that have already been coded*" – '610 Patent (Claim 6)

| Plaintiffs' Construction | Defendants' Construction |
| --- | --- |
| determining at least one pixel in the second group using already coded pixels within the first group and outside the block | Indefinite |

Disney cites the contradictory nature of Claim 6 to argue the term is indefinite "because it includes two mutually exclusive requirements"—namely that the "first group of pixels" must be in both the current block being coded and blocks that have already been coded. (Defs. Opening Br. at 11). InterDigital asserts this concern is rectified by its construction that omits the language "in blocks already coded"—a deletion to which Disney objects. (*Id.* at 12; Pltfs. Opening Br. at 11-14).

In the drafting process, the patentee amended Claim 6 to include "in blocks already coded" in response to the Examiner's rejection of a previous draft of the claim due to its similarity to the Chen prior art. (Defs. Opening Br. at 12, Ex. 14 ('610 File History) at 5-8). Because such differentiating language was essential to the '610 Patent (and Claim 6's) approval, the Court is perplexed by InterDigital's attempts to omit it from its construction of the term. Adopting this construction would be an

15

impermissible rewriting of the claim to revert it back to a version that was previously rejected by the Examiner for its similarities to prior art. *See Resh v. Hetzner*, No. EDCV 13-0830 JGB (SPx), 2014 WL 12588286, at *5 (C.D. Cal. Mar. 28, 2014) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (citing *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)).

Moreover, because it is impossible for the "first group" to be in "two places at once" per the plain language of the claim, the inclusion of "in blocks already coded" could yield a construction that is non-sensical," as explained by both InterDigital's own expert, Pierre Moulin. (Pltfs. Opening Br. at 13; Deposition of Pierre Moulin ("Moulin Tr."), Docket No 102-5 at 133:6-15). This contradictory claim language "deprive[s] the public of notice of the scope of the invention" and is therefore invalid as indefinite. *In re Shafovaloff*, No. 2024-1035, 2025 WL 1779173, at *2 (Fed. Cir. June 27, 2025).

     5. *"[a] reference type display[] having [a] reference color gamut"* – '268 Patent (Claims 1, 6, 7, 8, 11)

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| display capable of accurately displaying colors in accordance with a standardized color gamut | a display that supports a standardized color gamut |

Although the parties agree that a "reference color gamut" refers to a "standardized color gamut," (*see* Defs. Opening Br. at 14), they dispute the display reference in Claims 1, 6, 7, 8, and 11 of Patent '268 and whether it must "support" a reference color gamut, as Disney argues, or be "capable of accurately displaying colors in accordance" with the gamut, as InterDigital argues. Because "support" is "plain, objective, and readily understandable to a jury," Disney contends this is the appropriate construction of the term. (Defs. Opening Br. at 15). Plaintiffs'

16

construction, in Disney's view, would create unnecessary ambiguity. (*Id.*). InterDigital, on the other hand, contends that its construction aligns with the goal of the Patent to ensure "predictable results on displays with different color gamuts." ('268 Patent at 1:11-14).

The Court need not delve into the details of either side's arguments, as it finds the plain and ordinary meaning of the "reference type display having" term to suffice. Coupled with "standardized color gamut," as agreed upon by the parties, the claim can reasonably be construed as "a reference type display having a standardized color gamut." This yields the following inquiry: Does the display at issue include a standardized color gamut? If yes, it is encompassed by the claim language.[3]

> 6. "[a] non-reference type display[] having [a] non-reference color gamut" – '268 Patent (Claims 1, 6, 8, 11)

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| display capable of displaying colors in accordance with a color gamut other than the reference color gamut | a display that does not support a standardized color gamut |

The parties similarly disagree on whether the display should "support" or be "capable of displaying colors in accordance" with the relevant gamut. They additionally dispute the construction of "non-reference color gamut." For consistency's sake—and the same reasons discussed in Section II.B.5—the Court construes the claim in accordance with its plain and ordinary meaning and the previously construed term of "reference color gamut." A "non-reference color gamut" should be construed as one that is *not* a "standardized color gamut," in line with the parties' agreement on the related language in the previous claim. That finding coupled with the as-is language of the term that remains yields the following construction: "a non-reference type display that *does not* have a standardized color

---

[3] At oral argument, the parties agreed to the Court's construction.

gamut." The Court declines to infuse additional complexity into the claim construction by adopting either of the parties' proposed constructions. The language, as patented, takes precedence. Moreover, the parties set forth no evidence demonstrating that a POSITA would *not* be able to ascertain the claim's bounds from reading the patent documents. *See Phillips*, 415 F.3d at 1312–13, 1320.

> 7. *"at least one of a nonreference type display having a nonreference color gamut and a reference type display having a reference color gamut" – '268 Patent (Claims 1, 6)*

| Plaintiffs' Construction | Defendants' Construction |
| --- | --- |
| Plain and ordinary meaning: one or both of a display capable of accurately displaying colors in accordance with a standardized color gamut and a display capable of displaying colors in accordance with a color gamut other than the reference color gamut | at least one of each category of displays selected from category (1) a non-reference type display having a nonreference color gamut and category (2) a reference type display having a reference color gamut |

This claim construction's primary dispute is whether the "at least one of" language indicates a "conjunctive" list, as Disney argues, or a "disjunctive" list, as InterDigital asserts. Disney contends that the claim's construction is an open and shut case under Federal Circuit precedent established in *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 887 (Fed. Cir. 2004), finding that the use of "at least one of" language in the patent at issue "modifies each member of the list." *Id.* at 886. The Court doesn't believe the analysis is so simple. That case "did not erect a universal rule of construction for all uses of 'at least one of' in all patents." *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19, 2015). Rather, "[t]he *SuperGuide* court's construction of 'at least of' was based on the particular facts of the particular patent at issue there." *Id.*; *see also VendoNet, Inc. v. Redbox Automated Retail, LLC*, No. 13–cv–03475, 2014 WL 4555287, at *4 (N.D. Ill. Sept. 15, 2014) (finding that *SuperGuide* "did not announce

18

that its rule of grammar was a mandatory rule of claim construction, to be used even when unnecessary to serve the purpose of the invention").

Here, the facts of the patent at issue weigh in favor of a disjunctive construction. Because several embodiments in the '268 Patent depict only one of the two displays as inputs for the color correction system (*see* Figures 7 and 8), the Court is dissuaded from "interpret[ing] [the] claim terms in a way that excludes embodiments disclosed in the specification." *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) (rejecting claim construction that would exclude disclosed examples in the specification).[4]

For these reasons, the Court adopts Plaintiffs' claim construction that indicates a "disjunctive" list. *See Firtiva Corp. v. Funimation Glob. Grp., LLC*, No. 2:21-cv00111-JRG-RSP, 2022 WL 23165, at *7 (E.D. Tex. Jan. 3, 2022) (finding a term to be disjunctive when "at least two disclosed embodiments do not require all of the information types listed in th[e] term.").

8. "*side information components for modifying a functionality of said user interface*"- Patent '297 (Claim 1)

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | Governed by 35 U.S.C. § 112, ¶ 6 and indefinite[5] |

---

[4] Disney asserted at the claim construction hearing that the Federal Circuit's decision in *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007) should control the Court's construction of this term. The Court finds the Circuit's later opinion in *Oatey* to hold more weight. *Intamin* involved a claim that could reasonably be construed as not covering all embodiments in the patent. 483 F.3d at 1336–37. The term's scope here is similar to that in *Oatey*, where the Circuit declined to exclude an embodiment when it was not clearly disclaimed in the patent specification. 415 F.3d at 1277. Disney was unable to adduce probative evidence to show otherwise.
[5] Defendants argue that "[b]ecause the '297 Patent was filed before the effective date of the Leahy–Smith American Invents Act ("AIA"), pre-AIA 35 U.S.C. §112, ¶ 6

Disney contends that the term in Claim 1 of the '297 Patent is not only indefinite, but also invokes 35 U.S.C. § 112(6) as it recites a "mean-plus-function" claim without any description of structure. (Defs. Opening Br. at 19-20). If true, the term's construction can only "cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(6) (now renumbered as § 112(f)). InterDigital disagrees with this application and instead advocates for the claim to be construed according to its plain and ordinary meaning. (Pltfs. Opening Br. at 19).

Plaintiffs are correct that the absence of word "means" in the claim language creates a presumption that 35 U.S.C. § 112(f) does not apply. However, the Federal Circuit has lessened the stringency of that presumption and instructed lower courts that the core inquiry is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Section 112(6) will therefore apply "if [Disney] demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.*

"The question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term [such as 'side information components for modifying'] is subject to § 112(f) if it recites 'function without reciting sufficient structure for performing that function.'" *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020) (citing *Williamson*, 792 F.3d at 1348) (emphasis removed). To answer that question, the Court first turns to intrinsic evidence: the claim language, read in light of the specification. *See Umbanet, Inc. v. Epsilon Data Mgmt., LLC*, No. 2:16-cv-00682-JRG, 2017 WL 3508771, at *5 (E.D. Tex. Aug. 16, 2017). The '297 Patent includes references to "side information components" in

governs." (Defs. Opening Br. at 19). Plaintiffs do not dispute this fact.

20

nearly every claim, but nowhere does it detail how these components serve to "modify[] a functionality of [the] user interface." (*See generally* '297 Patent). Rather than directing this Court to evidence from the Patent specification to shed light on the purpose of "side information components" in Claim 1, InterDigital relies on expert testimony to claim that these components are merely data and serve no functional purpose. (Pltfs. Opening Br. at 21, Ex. F (Supplemental Declaration of Dr. Michael Sprenger ("Sprenger Decl.")) Dkt. No. 103-6 ¶¶ 8-9). But Dr. Michael Sprenger, Plaintiffs' own expert, also testified in deposition that these components are "a description of data that's being transmitted to enable . . . a receiving system to carry out certain modifications or functions." (Deposition of Dr. Michael Sprenger ("Sprenger Tr."), Dkt. No. 102-6 at 123:6-15). Such an admission convinces the Court that the claim term effectively recites "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1350. Without intrinsic evidence to counter this finding, the Court agrees with Disney that § 112(f) applies to this claim term. Because the "claim fails to disclose adequate corresponding structure to perform the claimed functions"—here, the role of "side information components" in the overall structure related to the modification of user interface functionality—the Court deems the claim term invalid as indefinite. *See Umbanet*, 2017 WL 3508771, at *6.

9. *"modifying a way in which said user can provide input into said user interface by using said stored side information components"* – '297 Patent (Claim 1)

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | modifying the way in which the user can input commands or operations into said user interface (e.g. changing from "pushing a displayed button" to "uttering |

|  | the respective keyword") by using the stored side information components |
|---|---|

The parties dispute whether this claim term should include a caveat to distinguish it from prior art known as Matsushita.  InterDigital advocates for a construction according to the plain and ordinary meaning, while Disney's proposes a construction that "require[s] a modification to the method by which a user inputs commands."  (Defs. Opening Br. at 22).  Disney primarily relies on the '297 Patent prosecution history to claim that the patentee explicitly disclaimed claim scope when they distinguished Claim 1's language from prior art.  (*Id.* at 23).  InterDigital objects on the basis that Disney's example is unrooted in the intrinsic evidence and improperly limits the claim scope in a manner that would confuse a jury.  (Pltfs. Opening Br. at 22).

In its prosecution of the claim at issue, the patentee in their initial iteration of the claim described the invention as "modifying said user interface by using said stored side information components."  (Defs. Responsive Br., Ex. 24, Dkt. No. 108-3 ¶ 1).  That specific language was rejected by the patent examiner for its similarity to the prior art of Matsushita, which "disclose[d] a method for modifying a user interface of a consumer electronic apparatus" that is "characterized by receiving side information comprising side information components for controlling said user interface."  (Defs. Opening Br., Ex. 18 ('297 File History 3/6/2007), Dkt. No. 102-19 at 4).  To rectify that concern, the patentee revised the language as follows:  the invention "modif[ies] *a way in which said user can provide input into* said user interface by using said stored side information components."  (*Id.*, Ex. 19 ('297 File History 8/28/2007), Dkt. No. 102-20 at 2) (emphasis added).  To distinguish Matsushita, the patentee noted that previous user interfaces were "defined and fixed" and could not be manipulated "once the respective apparatus has left the factory." ('297 Patent, 1:22-35).  Here, the "invention provides a broadcaster or other media

22

supplier with the capability to modify a way in which input to a user interface can be provided by a user." (Defs. Opening Br., Ex. 20 (Revised Appeal Brief), Dkt. No. 102-21 at 8). "For example, the instant invention allows for a voice controlled user interface." ('297 File History 8/28/2007 at 8). Such a distinction, and related amendments, ameliorated the Examiner's concerns related to prior art and allowed its inclusion in the final patent language. (*See* '297 Patent at 3:30-40). Disney, however, believes this is evidence of the patentee "clearly and unequivocally" disclaiming patent scope during prosecution. (Defs. Opening Br. at 23).

Where, as here, a "patentee has rejected the examiner's broad assessment of the claim scope and stated in a public record what his invention could not be[,] [t]hat statement is a deliberate surrender of claim scope, unmistakable in its effect . . . ." *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1327 (Fed. Cir. 2003). As such, the Court agrees *some* scope was disclaimed in the prosecution history, but it is disinclined to adopt Disney's construction that might lead a jury to improperly limit the invention's modification capabilities to only "uttering the respective keyword." The patentee cited a voice-controlled user interface as *one* example of modification that distinguishes this claim from prior art. Moreover, the '297 Patent discloses other methods for modifying user input. For example, keywords "can appear as a table in a user-callable menu or can be added to the vocabulary of the speech recognition unit." ('297 Patent at 3:18-21). To vote, "[t]he user can then select one of the teams by pushing a displayed button or by uttering the respective keyword." (*Id.* at 3:21-25). The Abstract of the Patent itself describes the invention as one where "a user interface of a consumer electronic apparatus is modified, which can be used for example to update a given basic UI functionality or to temporarily implement isolated, dedicated UI sub-domains." ('297 Patent Abstract). Matsushita, on the other hand, "does not describe or suggest any other way of input than the mentioned keys," which include a power key, a screen display key, arrow keys and an enter key. (Defs. Resp. Br., Ex. 25 ('297 File History, 2/2/2011 Decision on Appeal), Dkt. No. 108-4 at 3). Disney

points to no intrinsic evidence to justify further limiting the claim term to exclude the possibility of modification through a "displayed button." That is not what the Court understands Matsushita to teach. Indeed, there is no evidence that a POSITA would be incapable of ascertaining the bounds of the claim term. As is the case here, the "specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Symantec Corp.*, 811 F.3d at 1364 (citation omitted).

Accordingly, the Court concurs with InterDigital that the term should be construed according to its plain and ordinary meaning.

## IV.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** the construction of the disputed claims as stated herein.

Date: April 7, 2026

_____
HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE

24