Richard A. Kamprath (admitted *pro hac vice*)
rkamprath@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Nancy Olson (SBN 260303)
nsolson@olsonstein.com
David Stein (SBN 198256)
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane, #301
Newport Beach, CA 92663
Telephone: (310) 916-7433

*Additional Counsel in signature block
Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION**

| | |
|---|---|
| INTERDIGITAL, INC., *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, *et al.,*<br><br>Defendants. | **Case No. 2:25-cv-00895-WLH-BFM**<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS UNDER FED. R. CIV. P. 12(C)**<br><br>Judge: Hon. Wesley L. Hsu<br>Courtroom: 9B<br>Hearing Date: June 26, 2026<br>Hearing Time: 1:30 p.m. |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   LEGAL STANDARD ............................................................................2

      A.   Rule 12(c) Motion for Judgment on the Pleadings ...............................2

      B.   Patent Eligibility Under 35 U.S.C. § 101 ..................................................3

III.  ARGUMENT.........................................................................................4

      A.   Disney's Motion Relies on Matters Outside the Pleadings and Should Be Converted to a Motion for Summary Judgment..................4

      B.   The '301 Patent Is Directed to Patent-Eligible Subject Matter............5

           1.   *Alice* Step One – The Claims Are Directed to Specific Video Coding Methods that Improve Computer Technology. ...5

           2.   *Alice* Step Two – The '301 Patent Includes Limiting Inventive Concepts..................................................................12

      C.   The '818 Patent Is Directed to Patent-Eligible Subject Matter...........13

           1.   *Alice* Step One – The Claims Are Directed to Specific Video Coding Methods that Improve Computer Technology. .13

           2.   *Alice* Step Two – The '818 Patent Includes Limiting Inventive Concepts..................................................................15

           3.   Disney's Arguments Regarding the '818 Patent Also Fail Because It Has not Shown That Claim 1 Is Representative of Claim 4...............................................................................15

      D.   The '268 Patent Is Directed to Patent-Eligible Subject Matter...........16

           1.   *Alice* Step One – The Claims Are Directed to Specific Color Correction Methods that Improve Computer Technology........16

           2.   *Alice* Step Two – The '268 Patent Includes Limiting Inventive Concepts..................................................................19

           3.   Disney's Arguments Regarding the '268 Patent Also Fail Because It Has not Shown That Claim 6 Is Representative of the Other Challenged Claims..............................................20

      E.   At a Minimum, Alice Step Two Raises Plausible Fact Disputes Which Requires Denying Disney's Motion. ...................................21

IV.   CONCLUSION ...................................................................................22

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Streaming Inc. v. Netflix, Inc.*,
836 F. App'x 900 (Fed. Cir. 2020) ........................................................18

*Adasa Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ...............................................................18

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014)........................................................................ *passim*

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
841 F.3d 1288 (Fed. Cir. 2016) .................................................4, 11, 20

*BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ...................................................... *passim*

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ........................................................4, 21

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
25 F.4th 976 (Fed. Cir. 2022) ......................................................... *passim*

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
927 F.3d 1306 (Fed. Cir. 2019) ...........................................................21

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
859 F.3d 1352 (Fed. Cir. 2017) ....................................................15, 21

*Coop. Entm't, Inc. v. Kollective Tech., Inc.*,
50 F.4th 127 (Fed. Cir. 2022) ..............................................................21

*Diamond v. Diehr*,
450 U.S. 175 (1981).............................................................................9

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ...................................................... *passim*

*Fleming v. Pickard*,
581 F.3d 922 (9th Cir. 2009) ................................................................3

*GoTV Streaming, LLC v. Netflix, Inc.*,
166 F.4th 1053 (Fed. Cir. 2026) ...................................................................20

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542 (9th Cir. 1989) .......................................................................5

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ....................................................................18

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ....................................................................18

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
942 F.3d 1143 (Fed. Cir. 2019) ..................................................................4, 7

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ....................................... 11, 14, 17, 19

*Mobile Acuity Ltd. v. Blippar Ltd.*,
110 F.4th 1280 (Fed. Cir. 2024) ..................................................................16

*Nokia Techs. Oy v. Warner Bros. Ent. Inc.*,
No. CV-25-1337-GBW, 2026 WL 622650 (D. Del. Mar. 5, 2026) ........... *passim*

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) .....................................................................3

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) .....................................................................3

**Statutes**

35 U.S.C. § 101 ....................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 7(a)......................................................................................5

Fed. R. Civ. P. 12(b)(6)................................................................................3

Fed. R. Civ. P. 12(c)...............................................................................1, 2, 5

Fed. R. Civ. P. 12(d) ...............................................................................1, 5

Fed. R. Civ. P. 56 ...................................................................................1, 5

## I.    INTRODUCTION

Disney's motion for judgment on the pleadings under 35 U.S.C. § 101 (ECF 175-1) is procedurally improper and substantively wrong. Although styled as a Rule 12(c) motion, Disney's arguments repeatedly rely on the Court's Claim Construction Order and the underlying extrinsic record. Under Rule 12(d), reliance on information outside the pleadings requires conversion to a motion for summary judgment. But regardless of whether analyzed under Rule 12(c) or Rule 56, Disney's motion fails on the merits for the same reason: Disney cannot meet its burden to prove as a matter of law that the Challenged Claims are directed to ineligible subject matter. The claims recite concrete technological improvements in video coding and digital color correction, and, at minimum, raise factual disputes regarding whether they contain an inventive concept or reflect unconventional solutions.

Each Challenged Claim is directed to a concrete improvement in how video-processing systems operate. None is human performable.

The *'301 Patent* improves motion-compensated prediction in video encoding by tying a "weighting factor" to an existing "reference picture index." By associating weighting information with and reusing the existing reference picture index, the encoder reduces the amount of data that must be transmitted in the encoded bitstream while improving prediction accuracy. This results in higher-quality video while transmitting less data (i.e., fewer bits) and requiring less processing power, thereby improving the quality and efficiency of the computer's encoding operation. It also improves the efficiency of transmitting the encoded bitstream to an end-user.

The *'818 Patent* improves video encoding efficiency by using a novel encoder method to predict the video-compression level (a "quantization parameter," or "QP") from neighboring regions of previously encoded video, which tend to have similar values. Instead of transmitting the full QP value each time, the encoder sends only the difference from the predicted value, reducing data transmission and processing while keeping the encoder and decoder synchronized and improving encoding efficiency.

This also enhances the quality and efficiency of the computer's encoding operation and improves the efficiency of transmitting the encoded bitstream to an end-user.

The *'268 Patent* improves digital color processing by using a two-step mastering workflow in which content is mastered for one type of display and then used to generate a second master for displays with different color gamuts, preventing distorted, inconsistent, or un-displayable colors across different display technologies, such as TVs and monitors. One way this is accomplished is by generating color-gamut-mapping metadata that enables consistent transformation of mastered image content across different display technologies without requiring separate remastering, thereby improving rendering consistency and image-processing functionality.

None of the Challenged Claims is directed to an abstract idea. None can be performed by a human using "pencil and paper." Rather, they recite specific implementations that change how codecs and image-processing pipelines function—improving computer-system encoding performance while creating more efficient bitstreams that in turn improve network performance delivering those bitstreams to users—exactly the type of "improvement to computer functionality" the Federal Circuit has repeatedly found patent-eligible.

Disney's arguments fail at both steps of the Supreme Court's *Alice* framework. At step one, by Disney's own admission, it commits the cardinal sin of § 101 analysis by improperly abstracting the claims by "stripping" away their structure, constraints, and technological context. *See* Mot. 8. At step two, Disney dissects the claims into isolated components and asserts—without evidence—that each is conventional, raising factual disputes that cannot be resolved on the pleadings.

Disney cannot establish, as a matter of law, that any Challenged Claim recites patent-ineligible subject matter, and its motion should be denied.

## II.    LEGAL STANDARD

### A.    Rule 12(c) Motion for Judgment on the Pleadings

Courts review Rule 12(c) motions for judgment on the pleadings under the

2

same standard as Rule 12(b)(6) motions to dismiss. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). The Court "must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Id.*

**B.    Patent Eligibility Under 35 U.S.C. § 101**

Whether a patent recites patent-eligible subject matter under § 101 involves a two-step analysis under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

***Alice Step One***. At step one, the court determines "whether the claims at issue are directed to a patent-ineligible concept," like an abstract idea. *Id.* at 218. To make this determination, courts ask "what the patent asserts to be the focus of the claimed advance over the prior art" by considering the asserted claims "in light of the specification." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020). At step one, courts must avoid describing the claims at "a high level of abstraction" or "untethered from the language of the claims" because doing so "all but ensures that the exceptions to § 101 swallow the rule." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016).

In cases involving inventions related to computer technology, the Federal Circuit has held that claims are patent-eligible when they focus on: (1) "specific asserted improvements in computer capabilities," or (2) "a solution to a problem specifically arising in the realm of computer networks or computers." *TecSec*, 978 F.3d at 1293; *see, e.g.*, *Enfish*, 822 F.3d at 1336–39 (claims directed to self-referential database table that improved "the way a computer stores and retrieves data in memory" through "increased flexibility, faster search times, and smaller memory requirements" not abstract); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259–60 (Fed. Cir. 2017) (claims directed to improved computer memory system with "programmable operational characteristics" that could be tailored to different processors not abstract);

3

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150–51 (Fed. Cir. 2019) ("*KPN*") (claims not abstract that "focus on a specific means or method that improves the relevant technology," namely modifying permutations to enhance error detection in data transmissions); *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 988 (Fed. Cir. 2022) (encoding claims, though mathematical, claim more than "a mathematical formula" and are "directed to an efficient, improved method of encoding data" via irregular repetition/accumulation).

**Alice Step Two.** If a patent claim fails at step one, the court proceeds to step two, where it "examine[s] the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221. Patent claims recite an "inventive concept" if they reflect "something more than well-understood, routine, conventional activities previously known to the industry." *Id.* at 225; *see, e.g.*, *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349–51 (Fed. Cir. 2016) (claims held patent-eligible where a "non-conventional and non-generic arrangement of known, conventional pieces" placed Internet filtering at a remote ISP server while allowing individualized user customization, thereby combining advantages unavailable in prior filtering systems); *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016) (holding claims patent-eligible that "entail[ed] an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)").

"[W]hether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

## III. ARGUMENT

### A. Disney's Motion Relies on Matters Outside the Pleadings and Should Be Converted to a Motion for Summary Judgment.

4

"If, on a motion under Rule [] 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "Pleadings" include only the complaint, answer, reply, and third-party claims. Fed. R. Civ. P. 7(a). Thus, when a court "goes beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a motion for summary judgment." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989).

Disney's § 101 arguments rely heavily on the Court's Claim Construction Order, which issued after briefing and a hearing and relies on extrinsic evidence, including expert declarations, deposition testimony, and technical dictionaries. ECF 170 ("Claim Construction Order") at 13, 14, 16, 21. The Court relied on technical dictionaries as "extrinsic evidence" in construing "weighting factor"—the very construction Disney now invokes to argue that the '301 Patent claims are ineligible. *Id.* at 12.

Disney repeatedly relies on the Order as proof of what the claims mean and why they are allegedly abstract. Disney invokes the Court's construction of "weighting factor" as "a coefficient for a multiplication operation that scales a value" to argue that the claims merely recite "mathematical computations." Mot. 8 (citing ECF 170 at 11–12). Disney relies on the constructions of "reference type display" and "non-reference type display" to characterize the '268 Patent as nothing more than "format conversion." *Id.* at 16–18 (citing ECF 170 at 5, 16–18).

Because Disney's motion relies on an order that is outside the pleadings and is grounded in extrinsic evidence, conversion to a motion for summary judgment under Rule 12(d) is required. But as explained below, Disney's motion fails on the merits regardless of whether the Court analyzes it under Rule 12(c) or Rule 56.

**B.      The '301 Patent Is Directed to Patent-Eligible Subject Matter.**

**1.      *Alice* Step One – The Claims Are Directed to Specific Video Coding Methods that Improve Computer Technology.**

The '301 Patent, directed to a specific improvement to video coding technology,

5

improves motion-compensated prediction by reducing extra data needed to apply weighted prediction while maintaining accurate video prediction. '301 Patent, cl. 8, 7:64–8:2, 8:57–67. In video coding, video is represented as a sequence of image frames composed of pixels, each containing color information expressed as bits. *See* Compl. ¶¶ 31–33. To reduce the amount of data that must be stored and transmitted for streaming and playback, while preserving quality, video codecs compress video by predicting portions of a current frame from previously coded frames, called "reference pictures," and encoding only the difference between the prediction and the actual image. '301 Patent, 1:26–42. Because portions of the frame are predicted, they do not need to be transmitted. *See id.* More accurate predictions require fewer bits to encode and transmit video. *Id.* at 1:32–36.

The specification explains that prior video prediction approaches suffered from two related problems. First, some methods failed to apply weighting to reference pictures at all, causing poor prediction performance during gradual brightness changes such as fades. '301 Patent, 1:37–44, 2:46–48 ("Video CODECs without weighting factors applied to reference pictures encode fading sequences very inefficiently.") Second, attempts to improve prediction through weighting required separate weighting information to be transmitted alongside the reference picture information, increasing data to be encoded and transmitted. *Id.* at 1:55–57, 2:42–46, 3:17–31, 7:55–63. Thus, prior systems either produced inaccurate predictions or required additional signaling overhead, reducing coding efficiency. *See id.*

Claim 8 addresses these problems through a specific, index-based weighting process implemented within the encoder pipeline. It ties a "weighting factor" to a selected reference picture through the picture's existing "reference picture index," modifies the prediction using that weight, and encodes the resulting difference "along with the reference picture index." '301 Patent, cl. 8. In other words, the same index identifies both the reference picture and its corresponding weight, eliminating the need to transmit additional weighting information, thereby improving encoding and reducing

6

the amount of data transmitted. Claim 8 thus requires that the "weighting factor" be "associated with a particular reference picture index," that the encoder modifies the motion-compensated reference picture "by the assigned weighting factor," and "encod[es]" a signal indicative of the resulting difference together with the "reference picture index." *Id.*

This index-based weighting approach improves how the encoder processes and transmits video data. By reusing the existing reference picture index to identify both the reference picture and its associated weighting factor, the encoder "dramatically reduce[s]" the signaling overhead (*i.e.*, data) required to transmit the weighting information. '301 Patent, 7:64–8:2, 8:57–67. The improved weighting process also produces more accurate predictions and smaller residuals, reducing the number of bits required to encode and transmit video. *See id.* at 1:32–36, 2:40–53. Rather than merely applying a mathematical weight, the claims fundamentally change how the encoder performs motion-compensated prediction and signals weighting information within the codec, improving encoding efficiency and thus "the way computers operate." *See Enfish*, 822 F.3d at 1336–39; *KPN*, 942 F.3d at 1149–50.

Binding Federal Circuit precedent confirms that the '301 Patent claims are patent-eligible. In *California Institute of Technology v. Broadcom Ltd.*, the Federal Circuit rejected the argument that claims directed to data-encoding techniques became abstract merely because they relied on mathematical operations. 25 F.4th at 988. Instead, the court held the claims eligible because they were "directed to an efficient, improved method of encoding data" that relied in part on "irregular repetition" to improve error-correction performance and thus "claim[ed] more than a mathematical formula." *Id.* The same logic applies here. Claim 8 does not merely apply mathematical weighting; it recites a specific index-based weighting process embedded within the video encoder pipeline that improves motion-compensated prediction while reducing the number of bits required to encode and transmit that data. By improving *how* the encoder performs weighted prediction and signaling, the claims improve encoding

efficiency (and improve network efficiency)—just as the encoding improvements in *California Institute of Technology* improved error-correction encoding. Such claims are "directed to a specific improvement to the way computers operate," not an abstract idea. *Enfish*, 822 F.3d at 1336–39.

The District of Delaware recently held that similar video-encoding claims were directed to a technological improvement, not an abstract idea. In *Nokia Techs. Oy v. Warner Bros. Ent. Inc.*, No. CV-25-1337-GBW, 2026 WL 622650 (D. Del. Mar. 5, 2026), the court held that claims implementing mathematical operations within a video codec were patent-eligible because they recited a "specific implementation" that "'improve[d] the functioning of the overall technological process of' encoding and decoding video sequences." *Id.* at *13 (quoting *KPN*, 942 F.3d at 1151). The claims improved motion prediction by reducing unnecessary calculations, "resulting in a more efficient process and necessitating less hardware to run the encoding." *Id.* The court rejected the argument that the claims were abstract because they used mathematics, explaining the claimed benefits were a "direct consequence of the implementation of the claimed method," not "result[s] divorced from the claim[]" language. *Id.* The same is true here. Claim 8 embeds weighting operations within a codec architecture that improves motion-compensated prediction while reducing the number of bits required to encode and transmit video data, yielding a "more efficient process" for encoding video. *Id.*

Disney ignores this clear technological improvement and controlling precedent, instead insisting on reducing the claims to an "abstract mathematical process applied to data," comparing it to a teacher assigning weights to homework or a credit bureau weighting inputs like payment history and debt. Mot. 6–8. As Disney asserts, after "strip[ping]" the "technical jargon" from the claim, nothing remains but a basic mathematical process. *Id.* at 8. Disney is wrong.

The "technical jargon" Disney seeks to strip away *is the claimed invention*. By discarding those key technical details, Disney eviscerates the claimed invention and

PLS.' OPP TO DEFS.' MOT. FOR J. ON THE PLEADINGS                    Case No. 2:25-cv-895 WLH(BFM)

does exactly what the Supreme Court and Federal Circuit forbid: it "describe[s] the claims at such a high level of abstraction and untethered from the language of the claims," that any software-based improvement becomes an "abstract idea." *Enfish*, 822 F.3d at 1335–37.

Claim 8 is not free-floating math. It recites a specific video coding method in which the weighting values are integral to the encoding process: a "weighting factor" is "associated with a particular reference picture index"; the encoder then modifies the motion-compensated reference picture "by the assigned weighting factor" to create a "weighted motion compensated reference picture"; and finally "encod[es]" the resulting difference "along with the reference picture index." *Id.* at cl. 8.

Disney cites several cases to suggest that claims "directed to mathematical operations" are per se ineligible for patenting. *See* Mot. 8–9. But the Federal Circuit and Supreme Court "ha[ve] made clear that 'an invention is not ineligible just because it relies upon a law of nature or mathematical algorithm.'" *Nokia Techs.*, 2026 WL 622650, at *13 (quoting *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.,* 758 F.3d 1344, 1350 (Fed. Cir. 2014)). "[A] claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a mathematical formula." *Diamond v. Diehr,* 450 U.S. 175, 187 (1981). And "[i]mprovements in software that result in a computer running more efficiently are functions that the patent laws were designed to protect." *Nokia Techs.*, 2026 WL 622650, at *13 (citing *Enfish,* 822 F.3d at 1335–36).

The claims in Disney's cases are distinguishable in one critical respect: they did not improve computer (or network) functionality. They also do not involve video coding technology. *Coffelt v. NVIDIA Corp.* involved computing a color from spatial vectors within a "steradian" region—a purely arithmetic exercise that simply used the computer as a tool and provided no improvement to computer functionality. 680 F. App'x 1010, 1010–12 (Fed. Cir. 2017). Nor did the claims in *Relevant Holdings, LLC v. MindGeek USA Inc.* improve computer technology; instead, they merely recited a

9

"method of ranking categories [or people]" by "assign[ing] a score" using a ranking formula. No. 2:21-cv-03174, 2021 WL 6103350, at *5 (C.D. Cal. Aug. 30, 2021).

Disney's assertion that compression, encoding, and decoding have "long been held abstract" vastly overstates the case law. Mot. 9. The Federal Circuit has never held that video coding itself is abstract. Rather, it has recognized that encoding claims are patent-eligible when, as here, they recite specific technological improvements. *See, e.g., Cal. Inst. of Tech.*, 25 F.4th at 988. The cases Disney cites instead involved generalized encoding or data conversion untethered to any claimed improvement in computer or codec functionality. For example, *directPacket Rsch., Inc. v. Polycom, Inc.* involved generalized "language translation" between incompatible protocols, No. 2024-1147, 2025 WL 1752247, at *4–5 (Fed. Cir. June 25, 2025); *Sensormatic Elecs., LLC v. Wyze Labs, Inc.* involved generic wireless surveillance and "dual encoding" lacking any "particular nonabstract configuration," No. 2020-2320, 2021 WL 2944838, at *3 (Fed. Cir. July 14, 2021); and *RecogniCorp, LLC v. Nintendo Co.* involved only "standard encoding and decoding" without improving the encoding process itself. 855 F.3d 1322, 1326–28 (Fed. Cir. 2017). The claims merely recited "a method whereby a user displays images on a first display, assigns image codes to the images through an interface using a mathematical formula, and then reproduces the image based on the codes." *Id.* at 1326. The *Nokia* court recently distinguished the claims in *RecogniCorp* from claims, like those here, that recite "a sufficiently specific implementation" of video encoding that improves encoder operation. 2026 WL 622650, at *12–13.

Disney's remaining step one arguments fail. Disney contends the claims do not improve "the computer itself." Mot. 10. But the claims do exactly that: they reduce the amount of data that must be encoded and transmitted, while improving the encoder's motion-compensated prediction. Disney acknowledges the specification's disclosure that associating weighting factors with reference picture indices reduces the amount of data to transmit, thereby making encoding more efficient. Mot. 2 (citing '301 Patent 7:64–8:2, 8:57–67). The Federal Circuit recognizes that such reductions in bits,

computations, memory, and bandwidth in a specific technological process are patentable improvements to computer functionality that survive § 101 challenges. *See Enfish*, 822 F.3d at 1336–39 (faster, more efficient data storage/retrieval structure improved computer operation); *Cal. Inst. of Tech.*, 25 F.4th at 988 (improved encoding scheme improved system operation); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313–16 (Fed. Cir. 2016) (rules that reduced manual effort and improved animation pipeline were eligible).

The specification also explains *how* Claim 8 achieves those improvements. Contrary to Disney's contentions, Mot. 10, Claim 8 sets out a specific process for assigning a weighting factor associated with a particular reference picture index, using that weight to modify the motion-compensated reference picture, and encoding the resulting difference along with that same index. '301 Patent at cl. 8, 1:58–2:14. By tying each weighting factor to the reference picture index—information already transmitted in the bitstream—the encoder avoids sending a separate weighting index for each block, which "dramatically reduces the amount of overhead" (*i.e.*, additional data that must be transmitted), while still allowing adaptive, block-level weighting. *Id.* at 7:55–8:2, 8:57–67.

Disney's reliance on "generic computer components" is likewise misplaced. Mot. 11. What matters is not whether the encoder uses conventional components, but whether the claims arrange those components in a specific way that improves how the encoder operates. *See BASCOM*, 827 F.3d at 1350–51; *Amdocs*, 841 F.3d at 1300–02. Here, Claim 8 ties adaptive weights to an already-transmitted "reference picture index" and encodes the residual "along with" that index, reducing required data and improving prediction within the encoder pipeline. '301 Patent at cl. 8, 1:58–2:14, 7:64–8:2, 8:57–67.

Accordingly, the '301 Patent claims recite a concrete improvement to computer functionality and are directed to patent-eligible subject matter.

11

**2.    *Alice* Step Two – The '301 Patent Includes Limiting Inventive Concepts.**

Because Claim 8 is not directed to an abstract idea, the Court should not reach Alice step two. Even if it does, Claim 8 recites an inventive concept.

The inventive concept inquiry is not a § 103 obviousness analysis. It "requires more than recognizing that each claim element, by itself, was known in the art." *BASCOM*, 827 F.3d at 1350. The relevant inquiry is whether the claim elements, "individually and as an ordered combination," were "well-understood, routine, [and] conventional." *Alice*, 573 U.S. at 217–18. Claim 8 recites a non-conventional arrangement of encoding operations that was not well-understood, routine, or conventional.

The specification explains that previous weighted-prediction approaches either inferred weights or transmitted separate weighting indices, both of which increased signaling overhead and coding inefficiency. '301 Patent, 1:37–51, 3:17–31, 7:55–63. Claim 8 instead ties each weighting factor to the same reference picture index already used for motion compensation and encodes the residual "along with" that index, eliminating separate weighting-factor signaling and improving coding efficiency within the codec pipeline itself. *Id.* at cl. 8, 7:64–8:2, 8:57–67. The claimed process changes how the encoder and decoder perform weighted prediction and signaling within the codec pipeline itself. *Id.* cl. 8, 1:58–2:14.

Nor can this codec-specific implementation be reduced to "pen and paper" mathematics. Claim 8 recites motion-compensated video encoding using reference pictures, prediction differences, bitstream signaling, and adaptive weighting within a video codec architecture—not computer implementation of abstract mathematical operations. *Id.* cl. 8, 1:58–2:14, 7:64–8:2. That is precisely the type of "non-conventional and non-generic arrangement of known, conventional pieces" that constitutes an inventive concept. *See BASCOM*, 827 F.3d at 1349–51 (claims patent-eligible where a "non-conventional arrangement of known, conventional pieces"

12

combined otherwise known filtering techniques at a remote ISP server with individualized user customization unknown in the prior art); *see also Nokia Techs.*, 2026 WL 622650, at *9 (video-encoding claims recited "nonconventional arrangement of elements" where claims "carve[d] out a specific method of sequencing image frames. . . unknown in prior art"). Claim 8 therefore recites an inventive concept under *Alice* step two.

**C.      The '818 Patent Is Directed to Patent-Eligible Subject Matter.**

**1.      *Alice* Step One – The Claims Are Directed to Specific Video Coding Methods that Improve Computer Technology.**

The '818 Patent is directed to a specific improvement to video coding—using neighboring QPs to predict and signal QP values more accurately and efficiently. *See* '818 Patent, cl. 1, 10:45–63, 15:26–37. In video coding, QP values control how much compression is applied to video data during encoding and transmission. *Id.* at 1:62–66, 2:7–9. Rather than transmitting a full QP value for each block, Claim 1 uses a shared predictor so the system sends only a small difference from a predicted value, reducing the amount of signaling data that must be transmitted, thereby improving bitstream efficiency without reducing quality. *Id.* at cl. 1, 10:40–63. The claims further define how that predictor is formed—using neighboring QPs from previously encoded or decoded units, including averaging "left" and "above" neighbors when available, and applying fallback rules otherwise. *Id.* The specification explains that "[t]he QP predictor is formed by multiple QPs from neighboring blocks of previously encoded/decoded coding units, using the same method at both the encoder and decoder, thereby reducing the signaling overhead required." *Id.* By contrast, prior approaches relied on only a single previously coded block or a slice-level QP, which failed to exploit local similarities in the video and required additional signaling overhead. *Id.* at 2:25–31, 4:29–40. By using multiple neighboring QPs to form the predictor, the claims produce a more accurate QP prediction, which in turn requires a smaller QP difference to be signaled, reducing bitstream overhead and improving compression efficiency

within the video-coding pipeline. *Id.* at 5:3–8, 10:45–47, 11:55–58. That is a concrete improvement to computer functionality. *See Enfish*, 822 F.3d at 1336–39; *McRO*, 837 F.3d at 1313–16.

As in *Cal. Inst. of Tech.* and *Nokia Techs.*, these claims implement mathematical operations within a specific video-coding process that improves computer functionality and are therefore not abstract. *See above*, Section III.B.1. Disney instead reduces the claims to merely "averaging neighboring values" and analogizes the predictor to projecting county voter turnout. *See* Mot. 12–14. Here again, Disney's improper abstraction strips away the claims' technical context—an approach that the Federal Circuit forbids. Claim 1 does not recite "averaging" in the abstract. It recites an improved and more accurate QP predictor that is integrated into the encoder pipeline that allows the encoder to transmit a smaller QP delta, thereby reducing signaling overhead and improving compression efficiency. '818 Patent at cl. 1, 10:40–63, 11:55–58. The Federal Circuit has repeatedly rejected such characterizations, warning that courts may not describe claims "at such a high level of abstraction and untethered from the language of the claims" that the technological improvement is lost. *Enfish*, 822 F.3d at 1337. Unlike projecting voter turnout, Claim 1 recites a specific technique for improving how computers encode, signal, and reconstruct video data. That is precisely the distinction drawn in *Enfish*: claims that improve computer functionality are not abstract.

Disney's reliance on cases addressing abstract mathematical algorithms fails for the same reasons as to the '301 Patent. *See above* § III.B.1. The '818 Patent does not merely apply mathematical formulas using generic computers as in Disney's cases; it recites a specific codec-implemented method that improves encoder operation by reducing signaling overhead and the amount of data that must be processed and transmitted.

Disney suggests the claims do not explain "how" the invention improves computer functionality. Mot. 14. But Claim 1 does exactly that. It explains how to

14

predict QP values using neighboring portions of the video—taking the mean of the left and above neighbors when available and applying defined fallback rules when unavailable—and then transmitting only the difference from that predicted value. '818 Patent at cl. 1. The specification confirms this shared prediction method is implemented at both the encoder and decoder to reduce signaling overhead. *Id.* at 10:40–63. By more accurately predicting QP values and transmitting smaller residual differences, the claimed method reduces bitrate overhead and improves compression efficiency within the encoder/decoder pipeline itself.

Accordingly, the '818 Patent claims are directed to patent-eligible subject matter and are not abstract.

### 2. *Alice* Step Two – The '818 Patent Includes Limiting Inventive Concepts.

The Court need not reach *Alice* step two because Claim 1 is not directed to an abstract idea. Regardless, Claim 1 recites an inventive concept. The specification explains that prior approaches for determining a QP relied on a single neighboring block or a slice-level QP, which failed to account for local similarities in the video and required additional signaling. '818 Patent at 2:25–31, 4:29–40, 10:29–47. Claim 1's shared-predictor approach improves prior art systems that used only one neighboring block to predict the QP and required significantly more overhead. This is a "non-conventional and non-generic arrangement of known, conventional pieces" that supplies an inventive concept. *See* § III.B.2; *BASCOM*, 827 F.3d at 1349–51; *Nokia Techs.*, 2026 WL 622650, at *9, 11.

### 3. Disney's Arguments Regarding the '818 Patent Also Fail Because It Has not Shown That Claim 1 Is Representative of Claim 4.

Disney has not carried its burden to demonstrate that the claims are "substantially similar and linked to the same" allegedly ineligible concept. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017). Claim 4 adds a

material limitation not present in Claim 1: the encoder "encod[es]" the QP–QP prediction difference only when there are non-zero coefficients. '818 Patent at cls. 1, 4. That limitation narrows when signaling occurs within the codec pipeline by requiring conditional encoding of the QP difference only in particular coding circumstances, directly affecting the claimed reduction in signaling and compression efficiency. Claim 4's conditional encoding requirement is a "non-frivolous" distinction that precludes representative treatment. *See Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290–92 (Fed. Cir. 2024). Because Claim 4 alters the claimed signaling behavior and technological operation of the encoder, it can materially affect both the step-one and step-two analyses. Disney therefore cannot simply assume, as it has, that Claim 1 is representative. *See* Mot. 21.

### D.    The '268 Patent Is Directed to Patent-Eligible Subject Matter.

#### 1.    *Alice* Step One – The Claims Are Directed to Specific Color Correction Methods that Improve Computer Technology.

The '268 Patent is directed to "methods and systems for color correcting to provide predictable results on displays with different color gamuts." '268 Patent at 1:11–14, 4:38–40. The specification explains that different display technologies—such as LCDs, cathode-ray-tube displays, and other consumer displays—support different color gamuts, meaning they can reproduce different ranges of color. *Id.* at 1:15–25. Content is typically mastered on professional calibrated reference-gamut ("RCG") displays, while consumers view that content on a wide variety of consumer non-reference ("CG2") displays with differing and often wider gamuts. *Id.* at 1:60–2:1, 3:1–20, 4:6–36. Because those gamuts do not match, content mastered for one display can appear distorted or inconsistent on another, so "the resultant colors may look dissatisfying on the target display" and "colors appear different than what they were intended to appear," while some colors may not be displayable on the target device at all, particularly for wide-gamut material. *Id.* at 1:26–30, 3:1–20.

Claim 6 addresses that technological problem through an ordered workflow.

Rather than independently mastering separate versions for different displays, Claim 6 first masters content for a non-reference color gamut and then uses that master to generate a reference-gamut version "using a color gamut mapping applied to the mastered color corrected picture content for display on the non-reference type displays." *Id.* at cl. 6, 4:56–5:4. The specification explains that this approach ensures there are no colors in the master that cannot be displayed on either the non-reference or reference displays—a "real benefit" over prior systems that performed mastering only for the reference gamut. *Id.* at 10:1–12, 1:26–44, 3:21–38. By generating linked display outputs from a shared master, the claimed method preserves consistent color relationships across different display technologies, avoids clipping and incorrect hue reproduction, and ensures that image data remains displayable across devices with different gamuts. *Id.* at 1:31–44, 3:21–53, 4:21–26 (all explaining failures in prior art). The claimed method therefore improves the consistency and accuracy of image rendering and the computer's image-processing pipeline. That is a concrete technological improvement. Claim 1 likewise recites a technological improvement through generating "metadata for a color gamut mapping" that enables controlled transformation of mastered image content across different display gamuts. *Id.* at cl. 1.

*McRO* confirms the '268 Patent claims are not abstract. There, the Federal Circuit held claims patent-eligible because they used specific rules to automatically generate synchronized 3D facial animation, emphasizing that "it is the incorporation of the claimed rules . . . that improved the existing technological process." 837 F.3d at 1314–15. Claim 6 likewise recites a rule-based workflow for processing image data across different color gamuts—first mastering content for a non-reference gamut and then deriving a reference-gamut version through a defined color mapping applied to that master. '268 Patent at cl. 6, 4:56–5:4. As in *McRO*, the claimed rules—not the mere use of a computer—drive the improvement by producing "predictable results on displays with different color gamuts." *Id.* at 4:38–40, 10:1–12.

Disney again over-abstracts the claims as mere "data conversion," but the Federal

17

Circuit has repeatedly held that claims are patent-eligible at *Alice* step one when they recite "specific asserted improvements in computer capabilities," rather than merely using computers "as a tool" to automate abstract processes. *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2022); *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022) (claims eligible where directed to a "specific and concrete technological advance" in RFID encoding). Claim 6 falls squarely within that line of authority. It does not recite generic conversion in the abstract; it recites an ordered workflow in which the RCG master is generated "using a color gamut mapping applied to the mastered color corrected picture content for display on the non-reference type displays having the non-reference color gamut," thereby imposing a defined dependency between the two mastered versions of the source picture content. '268 Patent at cl. 6, 4:56–5:4, 9:56–67. Those specific processing steps address a technological problem arising in digital image rendering across devices with different display gamuts by ensuring consistent and predictable rendering relationships between mastered outputs. The claimed dependency and processing sequence—implemented through defined image-processing operations and data flows—are central to the claimed improvement and cannot be stripped away. *See Enfish*, 822 F.3d at 1337.

Disney's reliance on non-precedential *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900 (Fed. Cir. 2020), is likewise misplaced. There, the claims were directed to abstract format conversion because they recited only generalized steps for converting and transmitting content, without any "specific advance in coding or other techniques for implementing that idea." *Id.* at 903–04. Unlike *Adaptive Streaming*, Claim 6 recites a specific, image-processing workflow that improves rendering consistency across different display gamuts rather than generalized format conversion. '268 Patent at cl. 6; *see also id.* at 4:56–5:4, 10:1–12.

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349 (Fed. Cir. 2023) is no better for Disney. Mot. 17–18. There, the claims merely recited generalized results— "receiving," "displaying," "converting," "storing," and "transmitting" video—without

explaining any technological solution or "how the alleged goal" was achieved. *Id.* at 1357–58. Claim 6, by contrast, recites the specific gamut-mapping workflow solving the specific problems described above. *See McRO, Inc.*, 837 F.3d at 1313–16.

A "human colorist" could not perform Claim 6 (Mot. 19) because Claim 6 does not claim the manual creative process of "color correction" to choose aesthetically preferred colors. *See* '268 Patent at 8:11–16 ("[T]he phrase 'color correction' refers to a creative procedure to manually choose the right (preferred) colors on the content creation side[.]"). The claimed improvement is the *specific* mastering workflow technique described above. '268 Patent at cl. 6, 4:56–5:4, 9:56–67. The claimed dependency-based process changes how image data is generated across different display types such that a human colorist *does not* have to manually master content for the range of CG2 displays.

Read as a whole, the claims are not directed to the abstract concept of "format conversion" (Mot. 17). Rather, they are directed to a specific improvement in computer-implemented mastering workflows that solves a concrete interoperability problem across different computer display technologies. *See Enfish*, 822 F.3d at 1336–39. The analysis therefore ends at step one of the *Alice* inquiry.

**2.   *Alice* Step Two – The '268 Patent Includes Limiting Inventive Concepts.**

Even if the Court reaches step two (it need not), Claim 6 supplies an inventive concept through its ordered workflow: content is first mastered for CG2, and the RCG master is then produced "using a color gamut mapping applied to the mastered" content. '268 Patent at cl. 6. The specification explains that this structure departs from prior approaches—such as single-gamut grading or ad hoc conversions—that led to clipping, hue shifts, and unpredictable rendering across devices. *Id.* at 1:15–44, 3:1–38. By requiring the RCG master to be derived from the CG2 master through a defined mapping, the claims change how image data is processed across the pipeline, yielding predictable and controllable results across different display gamuts. *Id.* at 10:1–12,

11:30–41. That ordered combination—CG2-first mastering followed by mapping-based generation of the RCG master—is a non-conventional arrangement that improved upon the prior art by preventing inconsistent or un-displayable colors across different display gamuts and supplies an inventive concept. *See* '268 Patent at 3:1–20, 4:56–5:4; *BASCOM*, 827 F.3d at 1349–51; *Amdocs*, 841 F.3d at 1300–02; *Nokia Techs.*, 2026 WL 622650, at *9, 11.

Disney improperly isolates "color correction" and "mastering" as individual concepts, while ignoring the ordered combination of the non-reference mastering and dependent reference mastering. *See* Mot. 20–22. The patent identifies creating the non-reference master first and using it to generate the reference master as a novel and marked improvement over prior systems. *See* '268 Patent at 4:56–5:4, 10:1–12; *see also id.* at 1:31–44, 3:21–53, 4:21–26.

Finally, relying on *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053 (Fed. Cir. 2026), Disney argues Claim 6 "never recites how any of its described results are technologically achieved." Mot. 21. But Claim 6 explains how the improved color correction is achieved: by first creating a master for a non-reference display and then generating the reference-display master by applying a color gamut mapping to that non-reference master. That is a specific implementation, not a claimed result untethered from *how* it is achieved. Disney's challenge thus also fails at step two.

### 3. Disney's Arguments Regarding the '268 Patent Also Fail Because It Has not Shown That Claim 6 Is Representative of the Other Challenged Claims.

Disney ignores material claim differences that alter both the step-one and step-two analyses. Mot. 22. Claim 1 implements a different architecture than Claim 6. Rather than requiring a two-master workflow, Claim 1 recites mastering for CG2 and "generating metadata for a color gamut mapping" used to transform that CG2 master for RCG. '268 Patent at cl. 1, 4:41–55. That metadata-driven approach reflects a technological improvement because it enables image-processing systems to transform

mastered image content across different display gamuts in a consistent and controlled manner without requiring independent remastering for each display type. It therefore relies on different modules, outputs, and processing structures—metadata generation versus creation of a mapped second master—that are not "substantially similar and linked to the same" alleged ineligible idea. *See Cleveland Clinic Found.*, 859 F.3d at 1360.

The dependent claims add limitations governing where and how mapping or metadata is generated and consumed (Claims 2–4, 8); device-specific execution (Claims 5, 10); and additional workflow constraints (Claims 7, 9, 11). Those limitations materially affect the eligibility analysis. Disney's conclusory grouping therefore fails to establish that Claim 6 represents the materially different asserted claims.

**E.    At a Minimum, Alice Step Two Raises Plausible Fact Disputes Which Requires Denying Disney's Motion.**

A motion for summary judgment or judgment on the pleadings under § 101 should be granted only where no plausible factual disputes exist after drawing all reasonable inferences from the intrinsic record in favor of the non-movant. *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022). Because Disney fails at step one, the Court need not reach step two. But if it does, Disney's step-two arguments for all claims raise factual disputes that cannot be resolved on the pleadings. Whether the claimed combinations were "well-understood, routine, [and] conventional" is a factual issue requiring clear-and-convincing evidence. *See Berkheimer*, 881 F.3d at 1368; *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019) (reversing Rule 12 dismissal where plaintiff alleged using HTTP "at a specific location" and "establishing a paired connection before transmitting data" were inventive, and court had "no basis" at pleadings stage to find those techniques "were well-known or conventional as a matter of law"). The Complaint and specifications of the Challenged Patents allege that the claimed combinations of elements were not routine and yielded concrete technical improvements. *See, e.g.,*

'301 Patent at cl. 8, 7:64–8:2, 8:57–67; ECF 1 ¶¶ 472–79; '818 Patent at cl. 1, 5:3–8, 10:40–63, 11:55–58; ECF 1 ¶¶ 511–15; '268 Patent at 4:41–5:35, 10:1–12, 11:30–41; ECF 1 ¶¶ 527–41. Disney has not met its burden—the Complaint raises plausible factual disputes regarding whether each patent introduces an inventive concept that precludes resolution now.

## IV.    CONCLUSION

For the foregoing reasons, Disney's motion should be converted to a motion for summary judgment under Rule 12(d) and denied. Regardless of whether the Court decides the motion under Rule 12(c) or Rule 56, Disney cannot show by clear-and-convincing evidence that any Challenged Claim is directed to ineligible subject matter, and the motion should be denied.

22

Dated: June 5, 2026

Respectfully submitted,

*/s/ Richard A. Kamprath*

Alan P. Block (CA Bar No. 143783)
ablock@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

Richard A. Kamprath *(admitted pro hac vice)*
rkamprath@mckoolsmith.com
R. Arden Seavers *(admitted pro hac vice)*
aseavers@mckoolsmith.com
Samuel L. Moore *(admitted pro hac vice)*
smoore@mckoolsmith.com
Joseph W. Micheli *(admitted pro hac vice)*
jmicheli@mckoolsmith.com
Daniel Iliasevitch *(admitted pro hac vice)*
diliasevitch@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1200
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Joshua W. Budwin *(admitted pro hac vice)*
jbudwin@mckoolsmith.com
George T. Fishback, Jr.
gfishback@mckoolsmith.com *(admitted pro hac vice)*
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, Texas 78701
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

Kevin Burgess *(admitted pro hac vice)*
kburgess@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300

23

Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Hannah Mirzoeff *(admitted pro hac vice)*
hmirzoeff@mckoolsmith.com
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Nancy Olson (SBN 260303)
nsolson@olsonstein.com
David Stein (SBN 198256)
dstein@olsonstein.com
**OLSON STEIN LLP**
240 Nice Lane, #301
Newport Beach, CA 92663
Telephone: (310) 916-7433

**Attorneys for Plaintiffs**

PLS.' OPP TO DEFS.' MOT. FOR J. ON THE PLEADINGS                    Case No. 2:25-cv-895 WLH(BFM)

## **L.R. 11–6.2 Certification**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,997 words, which complies with the word limit of L.R. 11-6.1, and likewise complies with the word limit set by Court Order dated February 6, 2025. *See* Dkt. 19 (WLH Standing Order for Newly Assigned Civil Cases) § G.4 (motion not to exceed 7,000 words).

Dated: June 5, 2026                          */s/ Richard A. Kamprath*
                                                      Richard A. Kamprath

PLS.' OPP TO DEFS.' MOT. FOR J. ON THE PLEADINGS                          Case No. 2:25-cv-895 WLH(BFM)